**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 7 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CARDTOONS, L.C., an Oklahoma
Limited Liability Company,

      Plaintiff - Appellant,

vs.

MAJOR LEAGUE BASEBALL
PLAYERS ASSOCIATION, an
unincorporated association,

      Defendant - Appellee.

No. 98-5061

---

**ON REHEARING EN BANC**
**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. No. CV-93-576-E)**

---

James W. Tilly (and Craig A. Fitzgerald, with him on the briefs), Tilly &
Fitzgerald, Tulsa, Oklahoma, for Plaintiff - Appellant.

Russell S. Jones, Jr. (and William E. Quirk, Shughart, Thomson & Kilroy, P.C.,
Kansas City, Missouri, and James W. Weger, Jones, Givens, Gotcher & Bogan,
Tulsa, Oklahoma, with him on the briefs), for Defendant - Appellee.

---

Before **SEYMOUR**, Chief Judge, **TACHA**, **BALDOCK**, **BRORBY**, **EBEL**,
**KELLY**, **HENRY**, **BRISCOE**, **LUCERO**, and **MURPHY**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

This case requires us to determine whether threats of litigation between purely private parties in a non-antitrust setting are immunized from liability under the Noerr-Pennington doctrine or under the right to petition clause of the First Amendment. Because purely private threats do not constitute a petition to the government, we hold that they are not constitutionally protected.

Background

The facts are undisputed. In 1992, Cardtoons, L.C. ("Cardtoons"), an Oklahoma limited liability company, took steps to produce parody baseball trading cards which contained the images of major league baseball players. After the cards were designed, Cardtoons contracted with Champs Marketing, Inc. ("Champs"), an Ohio corporation, to print the cards for a set fee.

Major League Baseball Players Association ("MLBPA") is the exclusive collective bargaining agent for all active major league baseball players and is responsible for enforcing the publicity rights of the players. In a June 18, 1993 letter to Cardtoons ("Cardtoons letter"), the MLBPA claimed that by producing and selling the cards, Cardtoons was "violat[ing] the valuable property rights of MLBPA and the players." I R. at 8. The MLBPA threatened to "pursue its full legal remedies to enforce its rights" if Cardtoons did not immediately cease production of the cards. Id. at 9.

On the same date, the MLBPA also sent a similar cease and desist letter to Champs (the Champs letter). It is this letter that is the source of the present controversy. In pertinent part, it stated:

> We understand that you have and are in the process of printing color drawings of active Major League baseball players in baseball trading cards for individuals associated with Cardtoons. This is to notify you that we believe that the activities of those individuals violate the valuable property rights of publicity of the MLBPA and the players themselves. Further, we believe that by printing the baseball trading cards at the request of Cardtoons, you are participating in Cardtoons' illegal activities.
>
> Accordingly, we request that you immediately cease and desist the printing of baseball trading cards of active Major League baseball players at the request of Cardtoons or others who are not authorized to use the likeness of active Major League baseball players.
>
> If I do not hear from you immediately confirming that you will agree to this request, I will have no alternative but to take all necessary action to enforce the rights of the players and the MLBPA against infringement of their rights.

Id. at 10, 10A. Upon receiving the letter, Champs informed Cardtoons that it intended to stop printing the cards.

On June 22, 1993, Cardtoons filed suit in federal district court seeking a declaratory judgment that its cards did not violate MLBPA's publicity rights and also seeking damages based on alleged tortious interference with the Champs

- 3 -

contract. MLBPA moved to dismiss for lack of subject matter jurisdiction and filed counterclaims seeking declaratory and injunctive relief, as well as damages for violation of its publicity rights. The court bifurcated the proceedings to first resolve Cardtoons' declaratory judgment request, finding that the damages issues were dependent upon the legality of the parody cards.

The district court initially adopted a magistrate judge's recommendations and ruled in favor of the MLBPA. See Cardtoons, L.C. v. Major League Baseball Players Ass'n, 838 F. Supp. 1501 (N.D. Okla. 1993). However, following the Supreme Court's decision in Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569 (1994), the district court concluded that the parody cards were protected under the First Amendment. Accordingly, the court vacated its initial decision and entered judgment in favor of Cardtoons. See Cardtoons, L.C. v. Major League Baseball Players Ass'n, 868 F. Supp. 1266 (N.D. Okla. 1994) ("Cardtoons I"). This court affirmed on appeal, determining that the cards were "an important form of entertainment and social commentary that deserve First Amendment protection." Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d 959, 976 (10th Cir. 1996) ("Cardtoons II").

Cardtoons returned to the district court to pursue its damages claims against the MLBPA. The court allowed Cardtoons to amend its complaint and assert new claims for prima facie tort, libel and negligence. All of Cardtoons' claims

- 4 -

stemmed from the allegations contained in the Champs letter. The district court concluded that the MLBPA was immune from liability under the Noerr-Pennington doctrine and entered summary judgment for MLBPA on all of Cardtoons' claims. Cardtoons, L.C. v. Major League Baseball Players Ass'n, No. 93-C-576-E (N.D. Okla. Mar. 12, 1998) ("Cardtoons III").

On appeal, a panel of this court upheld the grant of summary judgment. Cardtoons, L.C. v. Major League Baseball Players Ass'n, 182 F.3d 1132 (10th Cir. 1999) ("Cardtoons IV"). The panel majority determined that the Noerr-Pennington doctrine applies apart from its roots in antitrust. In determining whether immunity for writing the letters was appropriate, the panel majority focused on the two part test enunciated in Professional Real Estate Investors, Inc. v. Columbia Pictures, Inc., 508 U.S. 49, 60-61 (1993) ("PRE").

In critical part, the panel majority held that Noerr-Pennington immunity covered threats of litigation as well as the actual litigation itself. "We adopt the legal and policy rationales that have informed other circuits' extension of Noerr-Pennington immunity to prelitigation threats, and hold that whether or not they are consummated, such threats enjoy the same level of protection from liability as litigation itself." Cardtoons IV, 182 F.3d at 1137. The panel majority went on to hold that the MLBPA had probable cause to threaten the lawsuit against Champs, thus satisfying the PRE test. "Accordingly, the Champs letter enjoyed Noerr-

Pennington immunity as a threat of litigation." Cardtoons IV, 182 F.3d at 1139.

In dissent, Judge Ebel questioned whether Noerr-Pennington immunity should be extended to cover purely private threats. Rather than apply the two-part PRE test designed for litigation, Judge Ebel espoused a three part test for threats of litigation. A party seeking Noerr-Pennington immunity must show that the threat was (1) made in good faith; (2) was objectively reasonable; and (3) was a "proximate prologue to actual or imminent litigation." Cardtoons IV, 182 F.3d at 1142 (Ebel, J., dissenting).

Cardtoons sought rehearing en banc, arguing that the panel majority misapplied the Noerr-Pennington doctrine, and the case should be governed solely by the First Amendment right to petition. In particular, it pointed to the decisions in McDonald v. Smith, 472 U.S. 479 (1985) and Martin v. City of Del City, 179 F.3d 882 (10th Cir. 1999) as contrary to the panel opinion. We granted rehearing en banc. For the reasons stated below, we reverse the panel and remand.

I.      Noerr-Pennington Immunity

The Noerr-Pennington doctrine was first recognized in two antitrust cases: Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961) and United Mine Workers v. Pennington, 381 U.S. 657 (1965). The present case does not involve antitrust claims, and therefore, we must first address

the applicability of Noerr-Pennington outside the antitrust context.[1]

Noerr involved an extensive publicity campaign by the railroad industry aimed at changing state law to place various restrictions on trucking in the long-distance freight business. The trucking industry brought suit in antitrust, alleging violations of §§ 1 and 2 of the Sherman Act. The Court held that the railroads were immune from suit because "the Sherman Act does not apply to the activities of the railroads at least insofar as those activities comprised mere solicitation of governmental action with respect to the passage and enforcement of laws." Noerr, 365 U.S. at 138.[2]

This immunity was based upon two grounds. See City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 399 (1978) (noting the "two correlative principles" on which Noerr immunity was established); see also California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972). The first was a statutory interpretation of the Sherman Act.

To hold that the government retains the power to act in

---

[1]This Court was faced with the issue but did not decide it in Quark, Inc. v. Harley, Nos. 96-1046, 96-1048, 96-1061, 1998 WL 161035, at **7 (10th Cir. March 4. 1998) (unpublished order and judgment) ("Assuming, without deciding, that this circuit would extend the doctrine beyond the realm of antitrust litigation . . . .")

[2]Pennington extended this immunity to the right to petition the executive and California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972), further extended the doctrine to cover petitioning the courts, the third branch of government.

> [a] representative capacity and yet hold, at the same
> time, that the people cannot freely inform the
> government of their wishes would impute to the
> Sherman Act a purpose to regulate, not business activity,
> but political activity, a purpose which would have no
> basis whatever in the legislative history of that Act.

Noerr, 365 U.S. at 137. The second basis for immunity was predicated on the

First Amendment right to petition.

> Secondly, and of at least equal significance, such a
> construction of the Sherman Act would raise important
> constitutional questions. The right of petition is one of
> the freedoms protected by the Bill of Rights, and we
> cannot, of course, lightly impute to Congress an intent to
> invade these freedoms.

Id. at 137-38. The Court has referred to these two prongs as "[i]nterpreting the

Sherman Act in the light of the First Amendment's Petition Clause." Federal

Trade Comm'n v. Superior Ct. Trial Law. Ass'n, 493 U.S. 411, 424 (1990).

The logical dilemma in applying Noerr-Pennington outside of the antitrust

context is that Noerr's first rationale for immunity – an interpretation of the

Sherman Act – is not present. Supreme Court precedent gives us scant guidance

in resolving this issue. All of the cases in which the Supreme Court has applied

Noerr-Pennington immunity as such have involved antitrust claims. See e.g. PRE,

508 U.S. at 52; City of Columbia v. Omni Outdoor Advertising, 499 U.S. 365,

369 (1991); Superior Ct. Trial Law. Ass'n, 493 U.S. at 422; Allied Tube &

- 8 -

Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 497 (1988); Pennington, 381 U.S. at 659; Noerr, 365 U.S. at 129.

To the extent that Supreme Court precedent can be read to extend Noerr-Pennington outside of the antitrust context, it does so solely on the basis of the right to petition. See Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 742-43 (1983) (immunizing employer's law suit from NLRB injunction under the right to petition); NAACP v. Claiborne Hardware, 458 U.S. 886, 913-14 (1982) (granting First Amendment immunity to a nonviolent business boycott seeking to vindicate economic and equal rights). See also PRE, 508 U.S. at 59 (noting that the Court has "invok[ed Noerr] in other contexts" and has referenced it "by analogy"). But see Omni Outdoor Advertising, 499 U.S. at 384 (granting Noerr immunity to federal antitrust claims but permitting liability under state law "trade libel" and other claims based on the same underlying conduct).

The circuits have followed suit, eliminating the Sherman Act rationale outside of antitrust and focusing solely on the petition clause. For instance, the Third Circuit in WE, Inc. v. City of Philadelphia, 174 F.3d 322, 326-27 (3d Cir. 1999) stated: "This court, along with other courts, has by analogy extended the Noerr-Pennington doctrine to offer protection to citizens' petitioning activities in contexts outside the antitrust area as well. . . . [T]he purpose of Noerr-Pennington as applied in areas outside the antitrust field is the protection of the right to

petition." The Fifth Circuit has noted that "[a]lthough the Noerr-Pennington doctrine initially arose in the antitrust field, other circuits have expanded it to protect first amendment petitioning of the government from claims brought under federal and state laws . . . ." Video Int'l Production, Inc. v. Warner-Amex Cable Communications, Inc., 858 F.2d 1075, 1084 (5th Cir. 1988).[3]

While we do not question the application of the right to petition outside of antitrust, it is a bit of a misnomer to refer to it as the Noerr-Pennington doctrine; a doctrine which was based on two rationales. In our view, it is more appropriate to refer to immunity as Noerr-Pennington immunity only when applied to antitrust claims.[4] In all other contexts, including the present one, such immunity derives

---

[3] See also Aaron R. Gary, First Amendment Petition Clause Immunity from Tort Suits: In Search of a Consistent Doctrinal Framework, 33 Idaho L. Rev. 67, 95 (1996) ("Innumerable federal and state courts have concluded that the Noerr-Pennington doctrine is rooted in the First Amendment right to petition and therefore must be applied to all claims implicating that right, not just to antitrust claims.").

[4]Bill Johnson's is a good example of the need to distinguish between antitrust cases based upon the two prongs of Noerr-Pennington and non-antitrust cases based solely on the right to petition. The dissent characterizes Bill Johnson's as a direct application of Noerr-Pennington. However, such a characterization would lead to a direct conflict between Bill Johnson's and Professional Real Estate Investors, Inc. v. Columbia Pictures, Inc., (PRE), 508 U.S. 49 (1993). Noerr-Pennington immunity, as defined in all of the Noerr antitrust line of cases, is immunity from liability. PRE, in the context of antitrust, held that a lawsuit is immune from liability unless it is a sham (i.e. objectively unreasonable or reasonable but brought in bad faith). See 508 U.S. at 60. However, in Bill Johnson's, the Supreme Court specifically declared, in the context of an NLRA dispute, that an employer who brought a non-sham suit could still be held liable, even though the right to petition protected the suit from being

from the right to petition.

This distinction is not completely academic. Antitrust cases that grant Noerr-Pennington immunity do so based upon both the Sherman Act and the right to petition. These precedents, founded in part upon a construction of the Sherman Act, are not completely interchangeable with cases based solely upon the right to petition.

The Fifth Circuit antitrust decision in Coastal States Marketing, Inc. v. Hunt, 694 F.2d 1358 (5th Cir. 1983) is a classic example of the difficulties which can arise if this distinction is not made. MLBPA relies heavily upon this case for the proposition that Noerr-Pennington immunity extends to prelitigation threats of suit. In Coastal States, the plaintiff argued that defendants' threats to litigate could not be immunized under Noerr. "[B]ecause threats of litigation are not

enjoined. 461 U.S. at 748-49.

The conflict is apparent. Under the PRE standard, a plaintiff is immune from liability based upon a simple showing of objective reasonableness. Under Bill Johnson's, objective reasonableness is not enough and a court must further determine whether the plaintiff violated the law in bringing the suit. The only way to reconcile these cases is to limit them to the contexts in which they arose. PRE is an antitrust case; Bill Johnson's is not.

This distinction is important for two reasons. First, it cautions against describing Bill Johnson's as an application of Noerr-Pennington immunity rather than Petition Clause immunity. Second, and more importantly, it demonstrates that PRE must be limited to the antitrust context. Outside of that context, the Petition Clause protects objectively reasonable lawsuits from being enjoined, but requires a court to look at the underlying statute to determine whether the initiator of the suit can be held liable. Therefore, given the non-antitrust context of this case, the dissent's reliance on PRE in Part II, C is inapposite.

directed to a government, they do not fall within the rationale of petitioning immunity." Coastal States, 694 F.2d at 1367. The Fifth Circuit rejected this argument.

> Given that petitioning immunity protects joint litigation, it would be absurd to hold that it does not protect those acts reasonably and normally attendant upon effective litigation. The litigator should not be protected only when he strikes without warning. If litigation is in good faith, a token of that sincerity is a warning that it will be commenced and a possible effort to compromise the dispute.

Id.

If we were to refer to immunity based solely on the right to petition as Noerr-Pennington immunity, it would be very tempting to apply Coastal States in the present case. To do so, however, would be inappropriate. First, Coastal States rejected the right to petition as a basis for Noerr. "Noerr was based on a construction of the Sherman Act. It was not a first amendment decision." Coastal States, 694 F.2d at 1364-65 (footnote omitted). Second, and even more instructive, the Fifth Circuit specifically noted that its use of the term "petitioning immunity" went beyond the guarantees of the petition clause. "We reject the notion that petitioning immunity extends only so far as the first amendment right to petition and then ends abruptly." Id. at 1366.

Coastal States' grant of immunity to prelitigation threats was not based on

the right to petition and, therefore, does not inform our decision in the present non-antitrust case.[5] This is not to intimate that right to petition principles can never be drawn from Noerr-Pennington antitrust cases. Rather, it is merely a precautionary distinction designed to avoid drawing constitutional principles from propositions founded upon statutory construction.

II.    Right to Petition

We must now determine whether prelitigation threats communicated solely between private parties are afforded immunity from suit by the right to petition guaranteed by the First Amendment. We hold that they are not.

The First Amendment states: "Congress shall make no law respecting . . . the right of the people . . . to petition the Government for a redress of grievances." The right to petition "is implicit in '[t]he very idea of government, republican in form.'" McDonald v. Smith, 472 U.S. 479, 482 (1985) (quoting United States v. Cruikshank, 92 U.S. 542, 552 (1876)). "Certainly the right to petition extends to all departments of the Government. The right of access to the courts is indeed but one aspect of the right of petition." California Motor, 404

---

[5]The same is true of McGuire Oil Co. v. Mapco, Inc., 958 F.2d 1552 (11th Cir. 1992), an antitrust case which relied upon Coastal States in granting immunity to threats of litigation. Although the Eleventh Circuit mentioned the right to petition as one basis for Noerr-Pennington immunity, it specifically protected the threats of litigation under an interpretation of the Sherman Act. See McGuire Oil, 958 F.2d at 1560 (holding that "threats, no less than the actual initiation of litigation, do not violate the Sherman Act").

U.S. at 510; see also City of Del City, 179 F.3d at 887.

However, the right to petition is not an absolute protection from liability. In McDonald, petitioner wrote a letter to President Reagan accusing respondent of fraud, blackmail, extortion, and the violation of various individuals' civil rights. Respondent was being considered for the position of United States Attorney but was not appointed. He brought a libel suit against petitioner, who claimed that the right to petition gave him absolute immunity in his statements to the president. The Supreme Court disagreed.

> To accept petitioner's claim of absolute immunity would elevate the Petition Clause to special First Amendment status. The Petition Clause, however, was inspired by the same ideals of liberty and democracy that gave us the freedoms to speak, publish, and assemble. These First Amendment rights are inseparable, and there is no sound basis for granting greater constitutional protection to statements made in a petition to the President than other First Amendment expressions.

McDonald, 472 U.S. at 485 (citations omitted). The Court affirmed the lower courts in allowing the libel action to proceed. "The right to petition is guaranteed; the right to commit libel with impunity is not." Id. See also City of Del City, 179 F.3d at 889 (holding that right to petition is not absolute, and in state employment context, employee must demonstrate that petition for which he was fired involved matter of public concern).

If MLBPA were being sued for libelous statements made in a litigation

- 14 -

document filed with the court, McDonald would clearly allow the libel suit to continue as a matter of constitutional law.  Compare Restatement (Second) of Torts § 587 (1977) ("A party to a private litigation . . . is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding.").  Likewise, statements made in a letter threatening litigation are not absolutely protected by the petition clause of the First Amendment and are subject to the principles of state common law and state statutory law.

However, even in the context of Cardtoons non-libel claims, it is clear that the right to petition simply does not grant MLBPA immunity from suit.   The plain language of the First Amendment protects only those petitions which are made to "the Government."[6]  As Judge Ebel noted in his dissent to the panel opinion:

> The MLBPA's cease-and-desist letter to Champs
> threatening suit was never sent to the government; did
> not ask the government for any response or 'redress of
> grievances'; was not even known to the government

[6]The dissent does not address this plain language, but instead relies upon the concept of "breathing space," the interest of private parties in vindicating their legal rights, and public policy arguments in arguing that such private threats should be constitutionally protected.

> prior to Cardtoons' declaratory judgment action against the MLBPA; and did not ever result in any litigation.

Cardtoons IV, 182 F.3d at 1141. A letter from one private party to another private party simply does not implicate the right to petition, regardless of what the letter threatens. Even the antitrust text cited by the panel majority notes that "a mere threat directed at one's competitor to sue or to seek administrative relief does not involve or 'petition' the government . . . ." Philip E. Areeda & Herbert Hovenkamp, Antitrust Law, § 205e at 237. See also Rodime PLC v. Seagate Technology, Inc., 174 F.3d 1294, 1307 (Fed. Cir. 1999) (noting that meetings at which defendant persuaded potential licensees to end license negotiations with the plaintiff "had nothing to do with petitioning the government.").

MLBPA asserts that the decisions of other circuits are to the contrary. See Glass Equip. Dev., Inc. v. Besten, Inc., 174 F.3d 1337 (Fed. Cir. 1999); McGuire Oil Co. v. Mapco, Inc., 958 F.2d 1552 (11th Cir. 1992); CVD, Inc. v. Raytheon Co., 769 F.2d 842 (1st Cir. 1985); Coastal States Mktg., Inc. v. Hunt, 694 F.2d 1358 (5th Cir. 1983). These cases are distinguishable. First, CVD merely held that "the threat of unfounded trade secrets litigation in bad faith is sufficient to constitute a cause of action under the antitrust laws, provided that the other essential elements of a violation are proven." 769 F.2d at 851. We do not agree with MLBPA that the First Circuit thereby implied that good faith threats are immunized by Noerr-Pennington.

- 16 -

Second, and most importantly, all four cases arise in the antitrust context. As discussed earlier, both Coastal States and McGuire Oil grant immunity to prelitigation threats under a construction of the Sherman Act, not the right to petition. Neither Glass Equip. Dev. nor CVD even mention the right to petition. Although Glass Equip. Dev. does appear to treat both "actual or threatened infringement suits" the same for purposes of Noerr-Pennington immunity, 174 F.3d at 1344, we reject it, as well as the other three cases, to the extent they imply that the mere threat of suit between private parties constitutes a petition to the government.

The Supreme Court's decision in Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988) also lends support to our conclusion.[7] That case involved the National Fire Protection Association (NFPA), a private, voluntary organization which publishes the National Electrical Code. "Revised every three years, the Code is the most influential electrical code in the nation. A substantial number of state and local governments routinely adopt the Code into law with little or no change." 486 U.S. at 495. Changes in the Code could be approved by a simple majority vote of the members present at the NFPA's annual meeting.

---

[7]We acknowledge that Allied Tube is an antitrust case applying Noerr-Pennington and are therefore careful to distinguish between propositions grounded solely on the Sherman Act and those also grounded in the right to petition.

Respondent proposed amending the Code to include polyvinyl chloride conduit as an approved type of electrical conduit. Petitioner, the Nation's largest producer of steel conduit, feared that such approval would harm its business. It recruited over 150 people to attend the NFPA meeting and vote against the new proposal. Polyvinyl chloride conduit was rejected by a mere four votes, and respondent brought suit alleging violation of the Sherman Act.

Petitioner argued that it was immune from suit under Noerr-Pennington. The Court disagreed. "In this case, the restraint of trade on which liability was predicated was the Association's exclusion of respondent's product from the Code, and no damages were imposed for the incorporation of that Code by any government." Allied Tube, 486 U.S. at 500.

> Here petitioner's actions took place within the context of the standard-setting process of a private association. Having concluded that the Association is not a 'quasi-legislative' body, we reject petitioner's argument that any efforts to influence the Association must be treated as efforts to influence a 'quasi-legislature' and given the same wide berth accorded legislative lobbying.

Id. at 504. The Court specifically noted that communications with a private organization "did not take place in the open political arena, where partisanship is the hallmark of decisionmaking." Id. at 506. Without a petition to the government, "[t]he issue of immunity in this case thus collapses into the issue of antitrust liability." Id. at 509.

The present case is similar in many respects. MLBPA communicated with Champs in order to further its own business interests. Its efforts were successful when Champs refused to print the parody cards. Cardtoons brought suit alleging various violations of the law based upon MLBPA's action. MLBPA raised Noerr-Pennington as a defense. We hold, to paraphrase Allied Tube, that because there was no petition of the government in the present case, the issue of immunity collapses into the issue of state law liability.[8]

While there are many persuasive policy arguments in favor of granting immunity to private threats of litigation, these do not override the clear language of the First Amendment. Such arguments are best addressed to the state legislative bodies which can craft state law accordingly. See e.g. Gary, supra note 3, at 73-77 (noting that state common law typically shields certain litigation activity from defamation and tortious interference suits).

In summary, we hold that when the basis for immunity is the right to petition, purely private threats of litigation are not protected because there is no

---

[8]We also note in passing that an almost identical claim to that raised in this case was presented in Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 695 (1962) (plaintiffs claimed that "[d]efendants in 1943, by open threats of reprisals, allegedly frustrated certain arrangements which Continental had with the Climax Molybdenum Corporation for the manufacture of ferrovanadium."). Noerr immunity was discussed by the Court but was not mentioned in regard to this claim.

petition addressed to the government.

REVERSED and REMANDED.

98-5061, *Cardtoons v. Major League Baseball Players Association*

**LUCERO**, Circuit Judge, with whom **BRORBY** and **BRISCOE**, Circuit Judges, join, dissenting.

I cannot agree with the majority's proposition that the First Amendment protects an owner of intellectual property rights who blindsides an adversary with a lawsuit claiming infringement of those rights, but fails to shield that same owner when a more civilized notice and demand letter is sent in advance. Put another way, there is no sound basis for the conclusion that a complaint will be afforded immunity while a "cease-and-desist" letter will not, when both documents contain identical allegations. The majority's ruling encourages, nay demands, more litigation; it requires intellectual property owners to bypass the post office on the way to the court house and avoid the letter carrier in a rush to get to the process server.

Today's decision ignores the reality of intellectual property law, in which the enforcement of legal rights, and thus the invocation of the litigation process, is customarily commenced by a cease-and-desist letter. Consequently, the practical result of the majority's holding will be to force parties seeking to prevent the wrongful infringement of their intellectual property rights to ambush infringers with lawsuits or risk having to defend against retaliatory tort claims. Noerr -Pennington , as that body of jurisprudence has come to be known, has been applied to immunize from state tort claims objectively reasonable petitioning activity invoking the courts. In furtherance of the First Amendment interest in the

vindication of legal rights and the constitutional requirement that the right to petition be given the breathing space necessary to survive, the same immunity should be afforded to objectively reasonable allegations of infringement and threats of litigation contained in cease-and-desist letters.

I

The First Amendment guarantees "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. Although the Supreme Court has declared the right to petition to be "among the most precious of the liberties safeguarded by the Bill of Rights," United Mine Workers v. Illinois State Bar Ass'n, 389 U.S. 217, 222 (1967), the Court has provided only limited guidance as to the nature and scope of the protection the right affords.

A

The Supreme Court has provided some guidance as to the application of the right to petition in cases developing the Noerr-Pennington doctrine. As originally articulated by the Supreme Court, the Noerr-Pennington doctrine provides general immunity from antitrust liability under the Sherman Act to private parties who petition the government for redress of greivances, notwithstanding the anti-competitive purpose or consequences of their petitions. See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 135-38 (1961) (establishing immunity for petitions to a state legislature); see also United Mine

Workers v. Pennington, 381 U.S. 657, 670 (1965) (extending Noerr immunity to petitions to public officials). The Court emphasized in Noerr that "[t]he right of petition is one of the freedoms protected by the Bill of Rights, and we cannot . . . lightly impute to Congress an intent to invade these freedoms." Noerr, 365 U.S. at 137-38.

In California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972), the Court extended immunity to "the approach of citizens or groups of them to . . . courts." Id. at 510 (holding, in addition, that "[t]he right of access to the courts is indeed but one aspect of the right of petition") (citing Johnson v. Avery, 393 U.S. 483, 485 (1969); Ex parte Hull, 312 U.S. 546, 549 (1941)). In reaching this conclusion, the Court relied primarily on the constitutional underpinnings of the doctrine:

> We conclude that it would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-a-vis their competitors.

Id. at 510-11 ; see also City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 399 n.17 (1978) (noting that "[c]ases subsequent to Pennington have emphasized the possible constitutional infirmity in the antitrust laws that a contrary construction would entail in light of the serious threat to First Amendment freedoms that would have been presented") (citations omitted).

When applying the Noerr-Pennington doctrine in the antitrust context, this Circuit has placed similar emphasis on the First Amendment rights the doctrine is designed to protect. See, e.g., Zimomra v. Alamo Rent-A-Car, Inc., 111 F.3d 1495, 1503 (10th Cir. 1997); Instructional Sys. Dev. Corp. v. Aetna Cas. & Sur. Co., 817 F.2d 639, 650 (10th Cir. 1987). [9]

Because of its foundation in the First Amendment right to petition, the Supreme Court has applied the Noerr-Pennington doctrine, by analogy, outside of its aborigine roots in antitrust law. In NAACP v. Claiborne Hardware Co., 458 U.S. 886, 889-91 (1982), for example, merchants brought claims of common law malicious interference with business and violations of state statutory labor and antitrust laws against participants in a civil rights boycott. Comparing by analogy those common law and statutory claims to the economic regulation at issue in Noerr, the Court concluded that nonviolent boycotting activities were entitled to similar First Amendment protections because "a major purpose of the boycott . . . was to influence governmental action," and, unlike the petitioning activity in Noerr, the purpose was to vindicate important Fourteenth Amendment rights. See

---

[9] I therefore reject the Fifth Circuit's assertion that Noerr "was not a first amendment decision." Coastal States Mktg., Inc. v. Hunt, 694 F.2d 1358, 1364-65 (5th Cir. 1983). Indeed, the Fifth Circuit itself has taken inconsistent positions. See Video Int'l Prod., Inc. v. Warner-Amex Cable Communications, Inc., 858 F.2d 1075, 1083 (5th Cir. 1988) (holding that the purpose of the Noerr-Pennington doctrine is to protect the First Amendment right to petition the government).

- 4 -

id. at 914-15.  The following year, the Court again applied the Noerr-Pennington doctrine outside of the antitrust context.  In Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 734 (1983), a restauranteur filed a civil suit seeking to enjoin employees from picketing his restaurant.  The employees responded by filing a complaint with the National Labor Relations Board alleging the civil suit was a retaliatory action in violation of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1) & (4).  See id. at 734-35.  The question before the Supreme Court was whether, under the NLRA, the Board could enjoin the civil suit against the employees.  See id. at 740-43.  Based on the right to petition recognized in California Motor Transport, as well as a line of cases holding that the NLRA does not preempt state civil remedies for conduct deeply rooted in local concerns, the Court held that the Board could not enjoin a well-founded lawsuit.  See id.

In light of Claiborne Hardware and Bill Johnson's Restaurants, there can be little doubt that Noerr-Pennington immunity, as amplified by California Motor Transport, is mandated by the First Amendment right to petition, irrespective of any independent statutory basis it might also have, and " Noerr-Pennington immunity" has evolved into an umbrella term for First Amendment petitioning immunity.  Cf. First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 792 n.31 (1978) (citing California Motor Transport and Noerr for the proposition that "the

- 5 -

First Amendment protects the right of corporations to petition legislative and administrative bodies"); NAACP v. Button, 371 U.S. 415, 430-31 (1963) (citing Noerr's First Amendment protection of the railroads' governmental solicitations to support the proposition that the First Amendment also protects associating for litigation purposes).[10] Consistent with the Supreme Court's constitutional characterization of the doctrine, numerous other courts have applied Noerr-Pennington immunity, either directly or by analogy, to shield defendants from state tort claims. See, e.g., Cheminor Drugs, Ltd. v. Ethyl Corp., 168 F.3d 119, 128-29 (3d Cir. 1999); Video Int'l Prod., Inc. v. Warner-Amex Cable Communications, Inc., 858 F.2d 1075, 1082-84 (5th Cir. 1988); Havoco of Am., Ltd. v. Hollobow, 702 F.2d 643, 649-50 (7th Cir. 1983); Missouri v. National Org. of Women, 620 F.2d 1301, 1319 (8th Cir. 1980); Pennwalt Corp. v. Zenith

---

[10] Nor is the application of petitioning immunity limited to associational or political activity. The Court has long held that "[t]he grievances for redress of which the right of petition was insured, and with it the right of assembly, are not solely religious or political ones." Thomas v. Collins, 323 U.S. 516, 531 (1945); see also Illinois State Bar Ass'n, 389 U.S. at 223 (rejecting the contention that "the principles announced in Button were applicable only to litigation for political purposes") (citing Brotherhood of R.R. Trainmen v. Virginia, 377 U.S. 1, 8 (1964)). For example, in Bill Johnson's Restaurants, 461 U.S. at 743, the Court afforded immunity to an individual litigant seeking to vindicate private economic interests. Although in Martin v. City of Del City, 179 F.3d 882, 886 (10th Cir. 1999), we held that a government employee alleging he was terminated in retaliation for petitioning for the redress of grievances must show that the petition touches on matters of public concern, Martin's public concern requirement is inapplicable here because it was developed in light of the government's substantial interest in maintaining an efficient workplace.

Lab., Inc._, 472 F. Supp. 413, 423-24 (E.D. Mich. 1979), _appeal dismissed_, 615 F.2d 1362 (6th Cir. 1980); _Sierra Club v. Butz_, 349 F. Supp. 934, 937-39 (N.D. Cal. 1972); _Pacific Gas & Elec. Co. v. Bear Stearns & Co._, 791 P.2d 587, 595-98 (Cal. 1990); _Protect Our Mountain Env't, Inc. v. District Court_, 677 P.2d 1361, 1364-69 (Colo. 1984) (en banc).

I agree with the Fifth Circuit that "[t]here is simply no reason that a common-law tort doctrine can any more permissibly abridge or chill the constitutional right of petition than can a statutory claim such as antitrust." _Video Int'l Prod._, 858 F.2d at 1084. Therefore, I would conclude that the MLBPA is shielded from Cardtoons's state tort claims insofar as those claims arise from its protected petitioning activity. [11] This conclusion requires the resolution of two further questions: Does the Champs letter constitute petitioning activity within the scope of the First Amendment; and if so, to what extent does the Petition Clause protect MLBPA from state tort claims premised on the Champs letter?

**B**

The First Amendment refers to "petitions to the government." The paradigmatic petition to the courts is a complaint. _Cf._ _McDonald v. Smith_, 472

---

[11] To the extent _Grip Pak, Inc. v. Illinois Tool Works, Inc._, 694 F.2d 466, 471-72 (7th Cir. 1982), holds to the contrary, I would reject the holding of that case. We also note that another panel of that circuit overlooked or ignored the _Grip Pak_ decision in reaching a result consistent with our own. _See_ _Havoco of Am., Ltd._, 702 F.2d at 649-50.

U.S. 479, 484 ("[F]iling a complaint in court is a form of petitioning activity."). At issue in this case, however, is a cease-and-desist letter between private parties alleging infringement of intellectual property rights and threatening a lawsuit. Based on the interests served by the Petition Clause and the requirement that First Amendment rights be given "breathing space," the concept of petitioning activity must embrace such a cease-and-desist letter.

The Supreme Court has not considered this precise issue, but has suggested that the application of immunity to activities, such as threats of litigation, incidental to the normal processes of litigation would be consistent with its holdings.  See Allied Tube & Conduit Corp. v. Indian Head, Inc. , 486 U.S. 492, 503 (1988)(holding a "claim of  Noerr  immunity cannot be dismissed on the ground that the conduct at issue involved no 'direct' petitioning of government officials, for  Noerr  itself immunized a form of 'indirect' petitioning") (citation omitted);  cf. Continental Ore v. Union Carbide & Carbon Corp. , 370 U.S. 690, 707 (1962) (distinguishing  Noerr  because the defendant in the case at bar was "engaged in private commercial activity, no element of which involved seeking to procure the . . . enforcement of laws").  More significantly, "[t]he first amendment interests involved in private litigation" as articulated in  Bill Johnson's Restaurants  , 461 U.S. at 743, support a concept of petitioning activity that includes actions incidental to litigation  .  These interests include

"compensation for violated rights and interests, the psychological benefits of vindication, [and] public airing of disputed facts." Id. So conceived, the right to petition the courts serves, in the context of private litigation, the purpose of vindicating legal rights. Put another way, conduct inducing administrative and judicial action "is protected by the firmly rooted principle, endemic to a democratic government, that enactment of and adherence to the law is the responsibility of all." Brownsville Golden Age Nursing Home, Inc. v. Wells, 839 F.2d 155, 160 (3d Cir. 1988) (applying petitioning immunity to the defendant's notification to government agencies and mobilization of public awareness concerning violations of the law at a nursing home).

Cease-and-desist letters threatening recourse to the judicial process if the alleged infringement of intellectual property rights continues, no less than complaints seeking redress for such an infringement, promote the interests served by the right to petition the courts: They vindicate legal rights and promote adherence to important laws of commerce. Cease-and-desist letters are frequently used by businesses and individuals to protect and vindicate their intellectual property rights. See generally Ronald B. Coolley, Notifications of Infringement and Their Consequences, 77 J. Pat. & Trademark Off. Soc'y 246, 246 (1995) (describing notification to suspected intellectual property infringers as a "common reaction" of rights holders). While the immediate purpose of cease-and-desist

letters may not be compensation or psychological benefit, cf. Bill Johnson's Restaurants , 461 U.S. at 743, they nonetheless seek vindication and financial gain through the protection of significant economic interests.  They do so by demanding adherence to the law, a demand every citizen has the right to assert. Cf. Brownsville , 839 F.2d at 160.  And although this demand is made directly, rather than via a governmental mechanism, its significance and efficacy are derived from the existence of laws creating and protecting intellectual property rights and the existence of courts to enforce those laws, not the brooding threat of force.  Nothing could better demonstrate this point than the fact that the notice of wrongdoing provided by the Champs letter is a condition precedent to MLBPA bringing a colorable claim against Champs for contributory infringement of publicity rights.   See, e.g. , Misut v. Mooney , 475 N.Y.S.2d 233, 236 (N.Y. Sup. Ct. 1984);  Maynard v. Port Publications, Inc. , 297 N.W.2d 500, 507 (Wis. 1980). In sum, the Champs letter constitutes a use of "the channels and procedures of state and federal . . . courts to advocate [the author's] causes and points of view respecting resolution of [its] business and economic interests vis-a-vis [its] competitors."  California Motor Transport , 404 U.S. at 511.

Applying petitioning immunity to widely-used methods of enforcing legal rights that precede any direct communication with the courts is also compelled by the Supreme Court's pronouncement that First Amendment rights require

"breathing space" to survive. *See* New York Times Co. v. Sullivan, 376 U.S. 254, 272 (1964); Button, 371 U.S. at 433. That principle was applied, although not by name, in Brotherhood of R.R. Trainmen v. Virginia Bar Ass'n, 377 U.S. 1 (1964). Rejecting the Bar Association's effort to enjoin a union from advising members to obtain legal counsel before settling injury claims and referring them to selected attorneys, the Court held that "[t]he State can no more keep these workers from using their cooperative plan to advise one another than it could use more direct means to bar them from resorting to the courts to vindicate their legal rights. The right to petition the courts cannot be so handicapped." *Id.* at 7; *see also* United Trans. Union v. State Bar, 401 U.S. 576, 585-86 (1971); Feminist Women's Health Ctr., Inc. v. Mohammad, 586 F.2d 530, 543 (5th Cir. 1978). The application of the concept of "breathing space" to the right to petition the courts is not limited to situations in which actions incidental to litigation implicate associational rights. *See* Pacific Gas & Elec., 791 P.2d at 595-98 (applying the concept of "breathing space" without reference to associational rights in reaching the conclusion that the Petition Clause prohibits premising tort liability on the defendant's conduct inducing another to bring a meritorious lawsuit); *cf.* South Dakota v. Kansas City Southern Indus., Inc., 880 F.2d 40, 53 (8th Cir. 1989) (holding, without reference to associational rights, that the defendant's assumed

assistance to litigants in the underlying suit "did not, as a matter of law, constitute 'sham' petitioning and was fully protected by the first amendment").

Like the incidental litigation activity in the cases just cited, cease-and-desist letters notifying the recipient of the infringement of intellectual property rights and threatening legal action, "must also be protected if the right of access to the courts is to have significance." The Consortium, Inc. v. Knoxville Int'l Energy Exposition, 563 F. Supp. 56, 59 (E.D. Tenn. 1983) (citing Pennwalt Corp., 472 F. Supp. at 413). As discussed, such letters are often the first formal step in the process of enforcing the law of intellectual property and vindicating economic interests. Frequently this step is quickly followed by the filing of a complaint with a court, be it by the rights holder for damages and injunctive relief or the recipient for declaratory judgment. See Coolley at 246. That is precisely what occurred in this case. Upon receiving the Cardtoons letter and notice of the Champs letter, Cardtoons preempted the threatened litigation by filing an action for declaratory relief, and MLBPA responded with counterclaims. By permitting liability under state common law for allegations and threats contained in cease-and-desist letters, while prohibiting liability for identical allegations made in a complaint filed with a court, the majority ignores the central role cease-and-desist letters play in the enforcement of intellectual property rights. The resulting bright-line rule chills the right to petition the courts by handicapping activity

immediately precedent to, and intimately associated with, recourse to the judicial process. [12] It is just such a result that the concept of "breathing space," born of the practical reality of the environment in which First Amendment rights are exercised, is meant to prevent.

In addition to sustaining the vitality of the fundamental right to petition and furthering the interests that right is intended to serve, the acknowledgment that Petition Clause immunity applies to cease-and-desist letters such as the one before us is consistent with sound public policy. As commentators have observed, this acknowledgment facilitates efforts to resolve disputes before resort is had to litigation. See Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law § 205e at 237 (rev. ed. 1997) (arguing that withholding immunity from prelitigation

---

[12] This immediate association with the judicial process distinguishes the Champs letter from the activity at issue in Allied Tube and Conduit Corp., 486 U.S. at 492. The Court in Allied held that efforts to influence the standard-setting process of a private trade association did not enjoy Noerr immunity. See id. at 509-10. However, it "expressly limited [its holding] to cases where an economically interested party exercises decisionmaking authority in formulating a product standard for a private association that comprises market participants," id. at 511 n.13 (citation and internal quotations omitted), indicating that this holding would not encompass, and therefore not preclude from immunity, efforts to influence "all private standard-setting associations." Id. With such repeated and explicit limitations, it is clear the Court did not foreclose the application of immunity to all indirect petitioning activities, such as to non-governmental associations as in Allied, or, as here, to cease-and-desist letters. On the contrary, as discussed, the Court emphasized a "claim of Noerr immunity cannot be dismissed on the ground that the conduct at issue involved no 'direct' petitioning of government officials, for Noerr itself immunized a form of 'indirect' petitioning." Id. at 503 (citation omitted).

communication would curb practices that "provide useful notice and facilitate the resolution of controversies"); Herbert Hovenkamp, Federal Antitrust Policy § 18.3d at 644 (1994) (immunizing prelitigation threats is vital to "[o]ur entire dispute resolution process[, which] is designed to encourage people to resolve their differences if possible before litigating").

Applying petitioning immunity to a cease-and-desist letter is not novel. Within the antitrust context, numerous courts have applied Noerr-Pennington immunity to claims arising from cease-and-desist letters, threats of litigation, and other pre-litigation enforcement efforts. See, e.g., Glass Equip. Dev., Inc. v. Besten, Inc., 174 F.3d 1337, 1343-44 (Fed. Cir. 1999); CVD, Inc. v. Raytheon Co., 769 F.2d 842, 850-51 (1st Cir. 1985); Miller Pipeline Corp. v. British Gas PLC, 69 F. Supp. 2d 1129, 1138 (S.D. Ind. 1999); PrimeTime 24 Joint Venture v. National Broad. Co., Inc., 21 F. Supp. 2d 350, 356 (S.D.N.Y. 1998); The Consortium, 563 F. Supp. at 59; Outboard Marine Corp. v. Pezetel, 474 F. Supp. 168, 174 (D. Del. 1979); cf. Alexander v. National Farmers Org., 687 F.2d 1173, 1200 (8th Cir. 1982) (noting that there may be situations in which threats of litigation against a competitor's customers would be protected under Noerr-Pennington). Likewise, outside of the antitrust context, federal district courts have afforded immunity from state common law claims based on similar pre-litigation efforts to enforce legal rights. See, e.g., Matsushita Elec. Corp. v. Loral

- 14 -

Corp., 974 F. Supp. 345, 359 (S.D.N.Y. 1997); Aircapital Cablevision, Inc. v. Starlink Communications Group, Inc., 634 F. Supp. 316, 325 (D. Kan. 1986); Pennwalt Corp., 472 F. Supp. at 424.

In order to provide breathing space to the First Amendment right to petition the courts, further the interests that right was designed to serve, and promote the public interest in efficient dispute resolution, I would follow other federal courts and accord cease-and-desist letters alleging infringement of intellectual property rights and threatening legal recourse the same level of immunity from tort liability as a complaint making the same allegations.

## C

That immunity is not, of course, absolute. In determining the proper scope of petition clause immunity for activities invoking the judicial process, the Noerr-Pennington doctrine once again provides the starting point. While broad and extensive, Noerr-Pennington immunity is not a shield for a petitioner whose conduct, although "ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." Noerr, 365 U.S. at 144. The Supreme Court has established a two-part definition of sham litigation:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under

- 15 -

Noerr, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere directly with the business relationships of a competitor," Noerr, 365 U.S. at 144, through the "use [of] the governmental process—as opposed to the outcome of that process—as an anti-competitive weapon," Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 380 (1991). This two-tiered process requires the plaintiff to disprove the challenged lawsuit's legal viability before the court will entertain evidence of the suit's economic viability.

Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 60-61 (1993). To ascertain "baselessness," a court must consider whether the litigant had "probable cause" to initiate the legal action. Id. at 62. If there is probable cause, the defendant automatically enjoys Noerr-Pennington immunity, and the second, subjective motivation prong of the Professional Real Estate test becomes irrelevant. See id. at 63. Probable cause to sue may exist when the law is unsettled or when an "action [is] arguably 'warranted by existing law' or at the very least [is] based on an objectively 'good faith argument for the extension . . . of existing law.'" Id. at 65 (quoting Fed. R. Civ. P. 11).

In establishing the requirements for the sham exception to the Noerr-Pennington doctrine, the Court emphasized that "[w]hether applying Noerr as an antitrust doctrine or invoking it in other contexts, we have repeatedly reaffirmed that evidence of anti-competitive intent or purpose alone cannot transform otherwise legitimate activity into a sham." Professional Real Estate,

- 16 -

508 U.S. at 59 (emphasis added). As an example of the emphasis on objective reasonableness as the linchpin of petitioning immunity outside the antitrust context, Professional Real Estate cites Bill Johnson's Restaurants, 461 U.S. at 743. In that case, the Court held "[t]he filing and prosecution of a well-founded lawsuit may not be enjoined as an unfair labor practice, even if it would not have been commenced but for the plaintiff's desire to retaliate against the defendant for exercising rights protected by the [National Labor Relations] Act." Bill Johnson's Restaurants, 461 U.S. at 743. [13] Thus, the Supreme Court has consistently held that petitioning activity invoking the judicial process is deserving of protection unless it is objectively baseless and motivated by an unlawful purpose.

In accordance with Professional Real Estate, I would conclude that MLBPA is entitled to immunity from all of Cardtoons's state tort claims arising from the Champs letter unless the allegations of wrongdoing and threats of litigation contained in the letter were objectively baseless, in the sense of lacking probable cause, and employed primarily for improper purposes.

Such a holding would be consistent with McDonald v. Smith, 472 U.S. 479 (1985), in which the Court addressed whether petitioning activity directed to the

---

[13] Bill Johnson's Restaurants went on to hold that the employee could proceed with his or her unfair labor practices case if the employer did not prevail in its state law claim. 461 U.S. at 747.

executive branch of government—specifically, a letter to the President—should be immune from a state tort claim of libel. Relying on White v. Nicholls, 44 U.S. 266 (1845), and New York Times Co. v. Sullivan, 376 U.S. 254 (1964), the Court held that the petitioning activity was not immune from liability for libel if carried out with actual malice, that is, "'falsehood and the absence of probable cause.'" McDonald, 472 U.S. at 484 (quoting White, 44 U.S. at 291); see also New York Times, 376 U.S. at 279-80 (defining actual malice as "with knowledge that it was false or with reckless disregard of whether it was false or not"). In a statement of particular relevance to this case, the Court noted that its conclusion that the First Amendment does not provide absolute immunity for petitions to the government was consistent with the principle at the heart of the Noerr-Pennington sham litigation test: "'[B]aseless litigation is not immunized by the First Amendment right to petition.'" McDonald at 484 (quoting Bill Johnson's Restaurants, 461 U.S. at 743; citing California Motor Transport, 404 U.S. at 513).[14]

To the extent there are any practical differences between McDonald's "actual malice" standard and Professional Real Estate's "objectively baseless"

---

[14] Contrary to the majority's suggestion, McDonald's conclusion that individuals do not enjoy absolute immunity from state common law claims arising from statements made in petitions to the government does not mean that there is no constitutional protection from such claims. Rather, McDonald makes it clear that state libel actions arising from petitioning activity cannot proceed unless the elements of libel are consistent with the constitutionally-mandated actual malice standard. 472 U.S. at 484-85.

standard, I would find the latter more applicable to petitioning activity invoking the judicial process through allegations of wrongdoing.  Moreover, I reject Cardtoons's suggestion that at the very least the McDonald standard should be applied in determining whether MLBPA is immune from the libel claim. Applying different standards to determine a defendant's immunity from different tort claims arising from the same petitioning activity would inject unnecessary confusion into the analysis of Petition Clause immunity, and perhaps even undermine such immunity by producing conflicting results.  In this case, for example, Cardtoons labels as libelous the assertion in the Champs letter that "[MLBPA] believe[s] that the activities of [Cardtoons] violate the valuable property rights of publicity of the MLBPA and the players themselves." (Appellant's App. at 10.)  This statement is coextensive with the allegations of wrongdoing—participating in those activities—on which the threats of litigation are based.  Doctrinal consistency requires that the issue of whether these statements will be afforded Petition Clause immunity be determined by a single standard—the objectively baseless standard. [15]

**II**

---

[15]  To the extent a libel claim is based on assertions in a cease-and-desist letter other than the legal and factual bases for the allegations of infringement and threats of litigation, the McDonald standard might be appropriate.

Applying this analytical framework to the case at bar, I agree with the district court's conclusion that the allegations of infringement and threats of litigation contained in the Champs letter were objectively reasonable. Therefore, I would affirm.

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 29 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CARDTOONS, L.C., an Oklahoma
Limited Liability Company,

     Plaintiff - Appellant,

v.

MAJOR LEAGUE BASEBALL
PLAYERS ASSOCIATION, an
unincorporated association,

     Defendant - Appellee.

No. 98-5061

---

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 93-CV-576-E)**

---

James W. Tilly (Craig A. Fitzgerald with him on the briefs), Tilly & Associates,
Tulsa, Oklahoma, for Plaintiff - Appellant.

Russell S. Jones, Jr. (William E. Quirk and Leslie A. Greathouse of Shughart
Thomson & Kilroy, Kansas City, Missouri, and James E. Weger of Jones, Givens,
Gotcher & Bogan, Tulsa, Oklahoma, with him on the brief), Shughart Thomson &
Kilroy, Kansas City, Missouri, for Defendant - Appellee.

---

Before **EBEL**, **McWILLIAMS** and **LUCERO**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

This case requires us to decide whether Noerr-Pennington immunity can attach to threats of litigation made with probable cause. Applying the "objectively baseless" test articulated in Professional Real Estate Investors, Inc. v. Columbia Pictures, Inc., 508 U.S. 49 (1993), the district court concluded that the non-consummated threats of a lawsuit made by the Major League Baseball Players Association to Cardtoons and Champs Marketing, Inc., enjoy Noerr-Pennington protection. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and affirm.

## I

Cardtoons, L.C. ("Cardtoons"), produces parody trading cards that feature caricatures of active major league baseball players.[1] Cardtoons contracted with Champs Marketing, Inc. ("Champs"), an Ohio corporation, to print the cards. Major League Baseball Players Association ("MLBPA"), the exclusive collective bargaining agent for all active major league baseball players, is the assignee of the publicity rights of current players and handles licensing agreements authorizing the use of their identities.

---

[1]A more thorough description of the humorous cards, as well as the less humorous litigation surrounding the cards' production, can be found in Cardtoons, L.C. v. Major League Baseball Players Assoc., 95 F.3d 959, 962-64 (10th Cir. 1996).

In a letter to Cardtoons dated June 18, 1993 ("Cardtoons letter"), MLBPA claimed that by producing and selling the cards, Cardtoons was "violat[ing] the valuable property rights of MLBPA and the players." The MLBPA threatened to "pursue its full legal remedies" if Cardtoons refused to cease production and sale of the cards. Appellant's App. at 8-9. In a similar letter dated the same day ("Champs letter"), MLBPA also threatened Champs with litigation if it did not stop "participating in Cardtoons's illegal activities." Appellant's App. at 10. Upon receipt of the letter, Champs notified Cardtoons that it intended to stop printing the cards.

Four days later, Cardtoons filed suit in federal district court for a declaratory judgment on the issue of whether its cards violated MLBPA's publicity and intellectual property rights. Also seeking injunctive relief,[2] Cardtoons asked the court to bar MLBPA from interfering with Champs and other third parties involved in the production and sale of the cards. Additionally, the suit alleged that MLBPA had tortiously interfered with Cardtoons's contractual relations with Champs. MLBPA moved to dismiss the complaint for lack of

---

[2]As part of its request for injunctive relief, Cardtoons sought a temporary restraining order and preliminary injunction to prevent MLBPA from interfering with Cardtoons's contractual relations with Champs. Cardtoons subsequently withdrew its request for these additional remedies when they were rendered moot by Champs's decision to stop producing the cards.

subject matter jurisdiction, and filed counterclaims seeking declaratory judgment, injunctive relief, and damages under Oklahoma's publicity rights statute, Okla. Stat. tit. 21 § 839.1 and 839.2 (1993).

Unless Cardtoons was entitled to produce and sell the cards, as alleged in the claim for declaratory judgment, it could not recover damages on the tortious interference claims. Therefore, the parties agreed that before the adjudication of Cardtoons's tort claim, a magistrate judge should conduct an evidentiary hearing and issue a report limited to Cardtoons's declaratory judgment claim and MLBPA's counterclaims.

Concluding that Cardtoons's activities violated the baseball players' rights of publicity under Oklahoma law, the magistrate recommended judgment on these claims in favor of MLBPA. The district court initially adopted the recommendation. See Cardtoons, L.C. v. Major League Baseball Players Ass'n, 838 F. Supp. 1510 (N.D. Okla. 1993). Following the Supreme Court's decision in Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569 (1994), however, the district court concluded that the parody cards enjoyed First Amendment protection against MLBPA's infringement claims. Accordingly, the court vacated its initial decision and entered judgment for Cardtoons. See Cardtoons, L.C. v. Major League Baseball Players Ass'n, 868 F. Supp. 1266 (N.D. Okla 1994) ("Cardtoons I"). We affirmed, holding that the parody cards are "an important form of

entertainment and social commentary that deserve First Amendment protection."

Cardtoons, L.C. v. Major League Baseball Players Assoc., 95 F.3d 959, 976 (10th Cir. 1996) ("Cardtoons II").

Having prevailed on the declaratory judgment claim, Cardtoons returned to the district court to pursue its claims for damages against MLBPA. In addition to the claim for tortious interference with contract, Cardtoons asserted new claims for prima facie tort, libel, and negligence, all stemming from the allegations contained in the Cardtoons and Champs letters. Concluding that both letters were immune from liability under the "Noerr-Pennington" doctrine, the district court granted summary judgment for MLBPA and dismissed all of Cardtoons's state law claims. See Cardtoons, L.C., v. Major League Baseball Players Ass'n, No. 93-C-576-E (N.D. Okla. Mar. 12, 1998) ("Cardtoons III"). Cardtoons challenges the court's application of the Noerr-Pennington doctrine and appeals the grant of summary judgment.[3] Cardtoons also appeals the court's decision to stay discovery pending its ruling on MLBPA's motion for summary judgment.

---

[3]In its briefs, Cardtoons seems to appeal the grant of summary judgment only with respect to the Champs letter. We note, however, that our conclusions would not change if the appeal also involved the Cardtoons letter.

## II

As originally articulated, the Noerr-Pennington doctrine provides general immunity from antitrust liability to private parties who petition the government for redress, notwithstanding the anticompetitive purpose or consequences of their petitions. See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 135-38 (1961) (establishing immunity for petitions to state legislature); see also United Mine Workers of America v. Pennington, 381 U.S. 657, 670 (1965) (extending Noerr immunity to petitions of public officials). The Court later extended Noerr-Pennington immunity to the right of access to courts. See California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972) (citations omitted). Moreover, because it emanates from the First Amendment right of petition, see Bright v. Moss Ambulance Service, Inc., 824 F.2d 819, 821 n.1 (10th Cir. 1987) (quoting City of Lafayette, La. v. Louisiana Power & Light Co., 435 U.S. 389, 399 (1978)), Noerr-Pennington immunity stands independent of its aborigine roots in antitrust, see, e.g., Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 742-43 (1983) (immunizing employer from prosecution for unfair labor practice even if an otherwise valid suit against employee is driven by a retaliatory motive); NAACP v. Claiborne Hardware Co., 458 U.S. 886, 913-14 (1982) (immunizing a nonviolent business boycott seeking to vindicate economic and equal rights); South Dakota v. Kansas City Southern

Indus., Inc., 880 F.2d 40, 50 (8th Cir. 1989) (immunizing defendant from claim of interference with contractual relations).

Although broad and extensive, Noerr-Pennington immunity is not a shield for a petitioner whose conduct, although "ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere with the business relationships of a competitor." Noerr, 365 U.S. at 144. The Supreme Court has established a two-part definition of sham litigation:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under Noerr, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere directly with the business relationships of a competitor," Noerr, 365 U.S. at 144, through the "use [of] the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon," Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 380 (1991). This two-tiered process requires the plaintiff to disprove the challenged lawsuit's legal viability before the court will entertain evidence of the suit's economic viability.

Professional Real Estate Investors, Inc. v. Columbia Pictures, Inc., 508 U.S. 49, 60-61 (1993).

To ascertain "baselessness," a court must consider whether the litigant had "probable cause" to initiate the legal action. Id. at 62. If there is probable cause, the defendant automatically enjoys Noerr-Pennington immunity, and the second, subjective motivation prong of the Professional Real Estate test becomes irrelevant. See id. at 63. Probable cause to sue may exist when the law is unsettled or when an "action [is] arguably 'warranted by existing law' or at the very least [is] based on an objectively 'good faith argument for the extension . . . of existing law.'" Id. at 65 (quoting Fed. R. Civ. P. 11).

Neither the Supreme Court nor this circuit has directly addressed the issue of whether Noerr-Pennington immunity attaches to the mere threat of a law suit. Confronted with this issue, however, three other circuits have concluded that prelitigation threats of suit enjoy the same immunity as litigation itself, so long as the threats are not shams. See McGuire Oil Co. v. Mapco, Inc., 958 F.2d 1552, 1558-60 (11th Cir. 1992); CVD, Inc. v. Raytheon Co., 769 F.2d 842, 850-51 (1st Cir. 1985); Coastal States Mktg., Inc. v. Hunt, 694 F.2d 1358, 1367 (5th Cir. 1983). In so holding, the Fifth Circuit reasoned that "it would be absurd to hold that [petitioning immunity] does not protect those acts reasonably and normally attendant upon effective litigation. The litigator should not be protected only when he strikes without warning." Coastal States, 694 F.2d at 1367. Commentators have agreed with this extension and have further developed the

-8-

policy rationales behind it. See, e.g., Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law § 205e at 237 (rev. ed. 1997) (withholding immunity from prelitigation communication would curb practices that "provide useful notice and facilitate the resolution of controversies"); Herbert Hovenkamp, Federal Antitrust Policy § 18.3d at 644 (1994) (immunizing prelitigation threats is vital to "[o]ur entire dispute resolution process[, which] is designed to encourage people to resolve their differences if possible before litigating").[4]

We adopt the legal and policy rationales that have informed other circuits' extension of Noerr-Pennington immunity to prelitigation threats, and hold that whether or not they are consummated, such threats enjoy the same level of protection from liability as litigation itself.[5] In addition, when considering

---

[4] Applying Noerr-Pennington protection to prelitigation threats is especially important in the intellectual property context, where warning letters are often used as a deterrent against infringement. See, e.g, Matsushita Electronics Corp. v. Loral Corp., 974 F. Supp. 345, 359 (S.D.N.Y. 1997) (concluding that policing letters sent to suspected patent infringers enjoyed Noerr-Pennington immunity); Thermos Co. v. Igloo Products Corp., 1995 WL 842002, *4 (N.D. Ill. Sept. 27, 1995) (same, for policing letters to alleged trademark infringers); see generally Ronald B. Coolley, Notifications of Infringement and Their Consequences, 77 J. Pat. & Trademark Off. Soc'y 246, 246 (1995) (describing notification of suspected intellectual property infringers as a "common reaction" of rights holders).

[5]The dissent would bifurcate the test for granting Noerr-Pennington immunity by applying the more lenient Professional Real Estate standard when a party files suit, while requiring a party who merely issues a threat to demonstrate that he acted both in "good-faith" and as a "proximate prologue to actual or imminent litigation." Diss. Op. at 6. This approach creates an incentive to

whether prelitigation threats enjoy <u>Noerr</u>-<u>Pennington</u> immunity, we conclude that

we must apply the two-part sham test of <u>Professional Real Estate</u>.[6]

### III

"We review the grant or denial of summary judgment de novo, applying the

same legal standard used by the district court pursuant to Fed. R. Civ. P. 56(c)."

<u>Kaul v. Stephan</u>, 83 F.3d 1208, 1212 (10th Cir. 1996) (citation and internal

quotation omitted).  Summary judgment is appropriate "if the pleadings,

---

litigate, and would not, as the dissent maintains, protect poorly financed entities like Champs from "private bullying communication."  Diss. Op. at 4.  Instead, such companies would become more vulnerable to ruinous lawsuits, as the threatening letter takes the form of a legal complaint.

[6] All of the prelitigation cases from other circuits were decided before <u>Professional Real Estate</u>, and provide us with no uniform standard to determine when a threat to litigate is worthy of <u>Noerr</u>-<u>Pennington</u> protection.  <u>See, e.g.</u>, <u>McGuire Oil</u>, 958 F.2d at 1560-61 & n.12 (applying subjective test and objectively baseless test); <u>CVD</u>, 769 F.2d at 851 (applying both a "bad faith" test and a test for clear and convincing evidence that the defendant's claim was objectively baseless); <u>but see</u> <u>Coastal States</u>, 694 F.2d at 1372 ("A litigant should enjoy petitioning immunity from the antitrust laws so long as a genuine desire for judicial relief is a significant motivating factor underlying the suit.").  We note, however, that to the extent these cases are inconsistent with <u>Professional Real Estate</u>, they are unfaithful to the <u>Noerr</u>-<u>Pennington</u> doctrine.  <u>See</u> <u>Professional Real Estate</u>, 508 U.S. at 57, 60 (describing the "objective reasonableness" test as part of the "original formulation" of the <u>Noerr</u>-<u>Pennington</u> sham exception, and declaring that "fidelity to precedent compels us to reject a purely subjective definition of 'sham'").  Indeed, the Eleventh Circuit, when applying a test for sham litigation after the Supreme Court had granted certiorari but before it had decided <u>Professional Real Estate</u>, implied that whatever test the Supreme Court articulates for granting immunity for litigation under <u>Noerr</u>-<u>Pennington</u> must similarly apply to prelitigation threats.  <u>See</u> <u>McGuire Oil</u>, 958 F.2d at 1560-61 & n.12.

-10-

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In the Noerr-Pennington context, "a court may decide probable cause as a matter of law" at the summary judgment stage when a defendant raises Noerr-Pennington immunity as a defense and the predicate facts are undisputed. Professional Real Estate, 508 U.S. at 63.

**A**

If MLBPA had probable cause to threaten Champs with litigation, the Champs letter enjoys Noerr-Pennington immunity under the Professional Real Estate test. To determine whether there was probable cause, we must first consider the validity of the underlying threatened action—the infringement suit against Cardtoons for its parody cards—and then turn to the validity of a cause of action against Champs as the printer of the cards.

Prior to our decision in Cardtoons II, the only federal appellate court decision addressing the constitutional tensions inherent in a celebrity parody provided some legal support for MLBPA's allegations against Cardtoons. See Cardtoons II, 95 F.3d at 970 (discussing White v. Samsung Electronics American, Inc., 971 F.2d 1395 (9th Cir. 1992)). At the time of its prelitigation threats against Champs, MLBPA therefore had probable cause to believe that Cardtoons's parody

-11-

cards infringed its publicity rights.  Furthermore, as Cardtoons II demonstrates, MLBPA's infringement claim was premised on a reasonable argument that its publicity rights outweighed Cardtoons's free speech rights.  See Cardtoons II, 95 F.3d at 970-76 (applying balancing test and concluding that Cardtoons's speech rights prevail over MLBPA's property rights).  Therefore, although MLBPA's infringement claim did not prevail, our prior adjudication shows that "a similarly situated reasonable litigant could have perceived some likelihood of success." Professional Real Estate, 508 U.S. at 65.  As such, the district court could reasonably conclude that MLBPA's threats against Cardtoons were "an objectively plausible effort to enforce rights" and deserved Noerr-Pennington protection.  Id.

Cardtoons argues that even if MLBPA's threats against Cardtoons enjoy immunity, our decision in Cardtoons II does not resolve the issue of whether Noerr-Pennington immunity attaches to the Champs letter.  In Cardtoons II, we applied Oklahoma's statutory right of publicity law.  Here, Cardtoons asserts, Ohio's common law of publicity rights controls because Ohio is the locus of Champs's conduct and its state of residence, and therefore has the most significant contacts to the torts alleged.  Ohio's "incidental use" exception to the right of publicity, Cardtoons contends, provides MLBPA with less protection for its publicity rights than it enjoyed under Oklahoma law.  Under Ohio law, therefore, MLBPA lacked probable cause for its threats against Champs.

Ohio law recognizes an incidental use exception to its right of publicity law that applies when a person's name or likeness is used "for purposes other than taking [commercial] advantage of his reputation, prestige, or other value associated with him." Zacchini v. Scripps-Howard Broadcasting Co., 351 N.E.2d 454, 459 n.4 (Ohio), rev'd on other grounds, 433 U.S. 562 (1977) (quotation and internal citation omitted). In our prior adjudication, we specifically noted that Oklahoma's right of publicity statute also contains a provision that is analogous to the concept of "incidental use." See Cardtoons II, 95 F.3d at 968. We discern no marked difference between the incidental use exception in Oklahoma and Ohio. In both states the applicability of the exception turns on the degree to which a defendant derives commercial benefit from its use of the plaintiff's name or likeness. See 12 Okla. Stat. tit. § 1449(E) (1999) (stating that whether the use of a person's "likeness [is] so directly connected with commercial" activity as to constitute a violation of the right of publicity presents a question of fact); Zacchini, 351 N.E.2d at 458 n.4 (stating that although the incidental use exception under Ohio law does not apply to the commercial exploitation of another's likeness, the mere fact that a defendant "seeks to make profit" from his endeavor is not enough to establish commercial use).

Moreover, MLBPA had a colorable claim for infringement under Ohio law. One Ohio court has applied the incidental use exception in a situation in which the

defendant used an Olympic athlete's name and likeness in the context of accurate, historical information on disposable drinking cups. See Vinci v. American Can Co., 591 N.E.2d 793, 794 (Ohio Ct. App. 1990). Because this use was not meant to support or promote the cups, the court found it to be merely incidental. See id. In our conclusion in Cardtoons II that the Oklahoma incidental use exception was inapplicable to the parody cards, we noted that "the players were specifically selected for their wide market appeal," and the use of their likeness was "directly connected with a proposed commercial endeavor." Cardtoons II, 95 F.3d at 968. Accordingly, MLBPA's claim would not have been foreclosed under Ohio law.

Even if MLBPA had probable cause to assert a claim of infringement against Champs in Ohio, Cardtoons argues, MLBPA lacked probable cause for the Champs letter because as a printer, Champs was a passive actor and is liable as a contributory tort infringer only if it knew or had reason to know that it was aiding and abetting an infringement. See, e.g., Misut v. Mooney, 475 N.Y.S.2d 233, 236 (N.Y. Sup. Ct. 1984); Maynard v. Port Publications, Inc., 297 N.W.2d 500, 507 (Wis. 1980). The Champs letter, however, provided the very notice that Misut and Maynard require. Cardtoons cannot argue that Champs was not liable unless it had

notice of an infringement, while also contending that MLBPA rendered itself ineligible for Noerr-Pennington immunity by providing the required notice.[7]

We therefore need not resolve the conflict of law and publicity rights issues that Cardtoons raises, because under either potentially controlling legal regime, MLBPA would have had probable cause on its infringement claim against Champs. Accordingly, the Champs letter enjoyed Noerr-Pennington immunity as a threat of litigation.

## B

Cardtoons contends that Noerr-Pennington immunity does not extend to its libel claim against MLBPA, which is based not on the MLBPA's threat of litigation but on the allegations in the Champs letter that Cardtoons violated the law. Specifically, the Champs letter states, "[MLBPA] believe[s] that the activities of [Cardtoons] violate the valuable property rights of publicity of the MLBPA and the players themselves." Appellant's App. at 10. The letter contains no further statements of fact or law concerning Cardtoons and its activities, except to characterize them as "illegal." Id.

---

[7]Moreover, the law of contributory infringement in the publicity rights context is not so settled that it would foreclose MLBPA from making a good faith argument for the extension of existing law by asserting a claim against Champs. See 1 J. Thomas McCarthy, The Rights of Publicity and Privacy § 3.7[E] (1999) (arguing that contributory infringement of a publicity right by a "passive actor" is a colorable claim for which there should be liability).

We hold that a defendant like MLBPA, who has probable cause to threaten litigation and makes no assertion beyond the legal and factual bases for the threats, may enjoy Noerr-Pennington immunity from a claim of libel. This holding is not inconsistent with McDonald v. Smith, 472 U.S. 479 (1985). There, the Court held that the First Amendment does not provide absolute immunity for petitions to the government that express libelous and damaging falsehoods. See id. at 485. In so holding, the Court relied on the principle at the core of the Noerr-Pennington doctrine that "'baseless litigation is not immunized by the First Amendment right to petition.'" Id. at 484 (quoting Bill Johnson's Restaurants, 461 U.S. at 743)).

We have already concluded that MLBPA's threats of litigation were not baseless because it had probable cause to assert a publicity rights infringement claim against Cardtoons. The statements that Cardtoons labels as libelous are coextensive with the threats of litigation to which we have already attached Noerr-Pennington immunity. If Cardtoons's argument prevails, a defendant would be exposed to libel claims even if his litigation or threat to litigate were supported by probable cause. By allowing an alternative cause of action against petitions that are otherwise eligible for immunity, the argument renders Noerr-Pennington a nullity.

**IV**

Cardtoons argues that it was prejudiced by the district court's stay of discovery pending its adjudication of MLBPA's summary judgment motion. It claims the stay barred it from attempting to discover whether MLBPA had any intent to pursue legal action against Champs, and whether MLBPA had performed any research on potential legal claims prior to issuing the threatening letters. Furthermore, Cardtoons claims that it hoped to discover evidence of MLBPA's subjective intent to dissuade Champs from performing its legitimate duties under its contract with Cardtoons.

Under the Professional Real Estate test, however, MLBPA's subjective intent would have been relevant only if its threats were objectively baseless. MLBPA presented sufficient predicate facts to demonstrate to the district court that as a matter of law, MLBPA had probable cause to threaten suit against Cardtoons and Champs, and that therefore its threats were not objectively baseless. Having affirmed the district court's conclusion that MLBPA is immune from all of Cardtoons's state law claims, we must affirm the district court's stay of discovery. See Professional Real Estate, 508 U.S. at 65-66 (holding that without proof that defendant's infringement action was objectively baseless, circuit court correctly denied request for further discovery).

The district court's opinion is **AFFIRMED**.

No. 98-5061, <u>Cardtoons, L.C. v. Major League Baseball Players Assoc.</u>

**EBEL, Circuit Judge, dissenting**

Although I agree with much of the majority opinion, I respectfully dissent from its holding that (1) prelitigation threats, "whether or not they are consummated . . . enjoy the same level of protection from liability as litigation itself" under the First Amendment doctrine of <u>Noerr-Pennington</u>; and (2) "when considering whether prelitigation threats enjoy <u>Noerr-Pennington</u> immunity . . . we must apply the two-part sham test" of <u>Professional Real Estate Investors, Inc. v. Columbia Pictures, Inc. (PRE)</u>, 508 U.S. 49 (1993). Maj. Op. at 9. The first holding is flawed because it assumes that all threats of litigation between <u>private parties</u> constitute petitions to the government (which is solely what <u>Noerr-Pennington</u> protects). The second holding is flawed because <u>PRE</u> determines only whether an acknowledged governmental petition is a sham undeserving of <u>Noerr-Pennington</u> immunity, but does not determine whether purely private communications that never go to the government should be considered a governmental petition in the first place. Therefore, granting <u>Noerr-Pennington</u> immunity to all prelitigation threats that satisfy <u>PRE</u>'s sham test wrongly extends <u>Noerr-Pennington</u> by immunizing a whole host of prelitigation threats that cannot meet even the threshold criteria of facially presenting a petition to the government. Considered together, the majority's holdings may be read to stand

for the proposition that all private correspondence between private parties that threaten objectively reasonable litigation shall be deemed to be petitions to government entitled to Noerr-Pennington immunity. To state this proposition is to refute it.

Starting with fundamentals, the Noerr-Pennington doctrine, which provides immunity for petitions to the government, derives from the First Amendment right "to petition the government for a redress of grievances." U.S. Const. amend. I (emphasis added). The Supreme Court has established that actual litigation is a form of petitioning the government protected by the First Amendment. See California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510-11 (1971) (defendants entitled to Noerr-Pennington for instituting state and federal proceedings because right to petition includes "right of access to the courts"); PRE, 508 U.S. at 60 (litigation is protected under Noerr-Pennington if it is not sham). However, it is an unwarranted leap neither compelled by the text of the First Amendment, nor the Noerr-Pennington line of cases from the Supreme Court or our circuit, to conclude that all purely private correspondence threatening suit constitutes a "petition [to] the government" under the First Amendment. [1]

---

[1] In fact, the majority admits that "[n]either the Supreme Court nor this circuit has directly addressed the issue of whether Noerr-Pennington immunity attaches to the mere threat of a law suit." Maj. Op. at 8.

Indeed, the facts of this case belie any suggestion that the MLBPA actually petitioned the government with regard to the threatening letter at issue here—specifically, the letter to Champs. The MLBPA's cease-and-desist letter to Champs threatening suit was never sent to the government; did not ask the government for any response or "redress of grievances"; was not even known to the government prior to Cardtoons' declaratory judgment action against the MLBPA; and did not ever result in any litigation. It seems an unreasonable stretch to shield this purely private correspondence between the MLBPA and Champs under the Noerr-Pennington aegis as a petition to the government.

Besides this textual problem, according Noerr-Pennington immunity to purely private correspondence poses practical problems. First, the government has supervisory power to prevent the misuse of actual petitions to the government. With litigation, for example, a district court has power under Fed. R. Civ. P. 11 to supervise pleadings, motions, and other representations "present[ed] to the court," and to issue sanctions for violations of the rule. In contrast, the government has much more limited power to regulate the misuse of purely private correspondence because such correspondence will seldom be brought to the government's attention.

Second, the majority's extension of Noerr-Pennington immunity to prelitigation threats will prove difficult to implement. How far back in time

should Noerr-Pennington immunity extend prior to an actual petition to the government? Litigation is often preceded by lengthy communications of an increasingly acrimonious nature. How early into the process would the majority extend immunity? Would the majority go back to include the first tentative statement of disagreement over the interpretation of a contract, perhaps even before litigation is contemplated? Would it apply Noerr-Pennington even earlier to the structuring of business deals in the first instance, where considerations of potential litigation are often spoken or unspoken factors? Does the word "litigation" have to be explicitly mentioned in the communication in order for it to be privileged, or may it be implied?

Here, all these difficult questions are enormously compounded because no litigation ever actually resulted between the MLBPA and Champs. The threatening cease-and-desist letter from the MLBPA did not at any time—even to today—culminate in an actual petition to the government against Champs. Indeed, Cardtoons suggests that the MLBPA commonly uses such threats of expensive litigation to bully poorly-financed entities who might tarnish the image of professional baseball players— regardless of whether the MLBPA has any intention to petition the government with a follow-up lawsuit. If this claim can be proven, then it escapes me why such private bullying communication should receive Noerr-Pennington immunity as if it were a petition to the government just

-4-

because it may state some theoretical but objectively supported claim.  When a large company has a practice of threatening others in purely private correspondence without any intent or custom to follow through with actual litigation, there is no basis for awarding Noerr-Pennington immunity under the fiction that the company has petitioned the government.  Granting Noerr-Pennington immunity to this type of correspondence declares open season for companies to engage in libelous, anticompetitive, or otherwise unlawful communications without fear of legal repercussion.

These textual and practical problems illustrate the imprudence of extending Noerr-Pennington immunity to all prelitigation threats.  Simply put, if all such threats between private parties constitute petitions to the government, as the majority premises, then the First Amendment's protection of the right "to petition the government" is transmogrified into a generalized constitutional immunity for private disputes not involving the government in any form.  Rather than suffer such a revision of the First Amendment, I would revise the majority's premise.

Noerr-Pennington should protect only prelitigation threats that have a strong and compelling nexus to actual litigation such that the threat may be considered an incipient part of a petition to the government.  To prove this nexus, I would require the party invoking Noerr-Pennington to show that its prelitigation

threat was a (1) good-faith, (2) objectively reasonable, and (3) proximate prologue to actual or imminent litigation. [2]

Each element of this three-part test is essential to properly limit the reach of Noerr-Pennington with respect to prelitigation threats. First, the prelitigation threat must be in good faith to ensure that Noerr-Pennington immunity would not protect a private party who sends a threatening communication without any actual bona-fide intent to petition the government. This good-faith requirement is consistent with all circuit cases applying Noerr-Pennington to threats of litigation, as these cases implicitly require such threats to be in good-faith. See McGuire Oil Co. v. Mapco, Inc., 958 F.2d 1552, 1559-60 (11th Cir. 1992) (stating that sham exception subjects to antitrust liability defendant whose activities, including threats of litigation, "are not genuinely aimed at procuring favorable government action at all" (emphasis added; quotations omitted)); CVD, Inc. v. Raytheon Co., 769 F.2d 842, 851 (1st Cir. 1985) ("[W]e hold that the threat of unfounded trade secrets litigation in bad faith is sufficient to constitute a cause of action under the antitrust laws, provided that the other essential elements of a violation are proven." (emphasis added)); Coastal States Marketing, Inc. v. Hunt, 694 F.2d

---

[2]This test differs from the majority's test because the majority would grant Noerr-Pennington immunity solely on the ground of an objectively reasonable basis for the threat without also requiring that the threat be in good faith and proximate to actual or imminent litigation.

1358, 1367, 1372-73 (5th Cir. 1983) (finding threats of litigation and ensuing litigation protected by petitioning immunity because they were in good faith); Alexander v. National Farmers Org., 687 F.2d 1173, 1200, 1203 (8th Cir. 1982) (refusing to grant Noerr-Pennington immunity to "a broad pattern of litigation threats and harassment" where they were not "in good faith" but rather "clearly constitute[d] bad faith unlawful harassment" (emphasis added)); cf. American Potato Dryers v. Peters, 184 F.2d 165, 173 (4th Cir. 1950) (in pre- Noerr-Pennington case, holding that "threats of suit . . . made in good faith" were not antitrust violations (emphasis added)).

Furthermore, contrary to what the majority intimates, see Maj. Op. at 9-10 n.5, 16-17, this requirement is consistent with PRE's two-part sham test. That test engages in a subjective inquiry only if the litigation first is determined to be objectively baseless. See PRE, 508 U.S. at 60. By its facts and terms, however, PRE applies to litigation, i.e., an actual lawsuit. See id. ("We now outline a two-part definition of 'sham' litigation. First, the lawsuit must be objectively baseless . . . . Only if the challenged litigation is objectively meritless may a court examine a litigant's subjective motivation." (emphasis added).) PRE's sham litigation test determines whether a petition to the government (in lawsuit form) qualifies for Noerr-Pennington immunity. However, PRE provides no guidance on whether or when a prelitigation threat between private parties

-7-

constitutes as a petition to the government. Hence, before we can apply PRE to determine which prelitigation threats, as petitions to the government, merit Noerr-Pennington immunity, we first must decide which prelitigation threats amount to petitioning activity. Requiring good-faith in this threshold inquiry, therefore, does not conflict with PRE, as PRE does not come into play until after the prelitigation threat is determined to be a petition to the government. [3] On the other hand, granting Noerr-Pennington immunity to all prelitigation threats that satisfy PRE, without winnowing out threats that cannot qualify as petitions to the government, erroneously extends Noerr-Pennington immunity beyond First Amendment activity.

Second, the objectively reasonable test is necessary to prevent Noerr-Pennington immunity from attaching to prelitigation threats that would have no basis as an actual petition, and therefore should not receive protection as petitioning activity. This element is coextensive with the objective prong of PRE.

Third, the proximity element ensures that Noerr-Pennington would immunize only those communications that are attendant to imminent or actual

_____

[3]As a result, the majority is wrong to imply that PRE contradicts the earlier circuit cases requiring threats of litigation to be in good faith in order to receive Noerr-Pennington immunity. While PRE may limit those cases to the extent that they also require actual litigation to be brought in good faith without first inquiring into objective baselessness, PRE does not touch upon the subjective test for whether threats of litigation should receive petitioning immunity.

litigation and consequently may be considered an initial part of the petitioning process.  If no petition actually results, it should be more difficult to establish proximity because the party claiming immunity should have to show some intervening cause that aborted an otherwise imminent petition.

Applied to the instant case, the three-part test cannot be met.  Although I agree with the majority that the prelitigation threat in the MLBPA's letter to Champs had an objective basis, I do not believe the record in its undeveloped state allows us to determine whether the MLBPA's correspondence with Champs was in good-faith or proximate to actual litigation.  As Cardtoons complains, the district court stayed discovery on the MLBPA's subjective intent regarding its threats pending summary judgment.  I therefore would reverse the district court's entry of summary judgment in favor of the MLBPA on the ground that the MLBPA enjoyed  Noerr-Pennington  immunity, and remand to allow Cardtoons to proceed with discovery on the MLBPA's subjective intent in threatening Champs with litigation, and the proximity of that threat to actual litigation.