DIRECTV, INC., a California Corporation Plaintiff/Counter–Cavanaugh,

v.

Brian CAVANAUGH,
Cavanaugh/Counter–
Plaintiff,

v.

Hughes Electronics, Third–
Party Cavanaugh.

No. 03–60001.

United States District Court,
E.D. Michigan.

Nov. 18, 2003.

Bradley H. Darling, Norman C. Ankers, Honigman, Miller, Detroit, MI, for Plaintiff and Counter–Defendant.

Fredrick W. Jensen, Jr., Allegan Law Offices, Allegan, MI, for Defendant, Third–Party Plaintiff and Counter–Claimant.

## OPINION AND ORDER OF THE COURT

BATTANI, District Judge.

Before the Court are DIRECTV's and Cavanaugh's motions for summary judgment. Cavanaugh moves for summary judgment as to DIRECTV's claims of un-

authorized signal reception in violation of 47 U.S.C. § 605(a), 18 U.S.C. §§ 2511–12, and Michigan common law. DIRECTV, for its part, moves for summary judgment of Cavanaugh's counterclaims of: (1) extortion and conspiracy to commit extortion under 18 U.S.C. § 876; (2) violations of the Fair Debt Collections Practice Act ("FDCPA"), 15 U.S.C. § 1692, and the Michigan Fair Collection Practices Act, M.C.L. § 339.901; (3) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962; (4) violations of the Michigan Consumer Protection Act ("MCPA"), § 445.911 *et seq.*; (5) fraud and misrepresentation; and (6) defamation. Both motions are GRANTED in part and DENIED in part.

## I. BACKGROUND

DIRECTV is in the business of distributing television broadcasts through encrypted satellite transmissions. To access DIRECTV's television programming legally, customers must purchase a DIRECTV access card and receiver. Several companies have engaged in the sale of equipment that illegally modifies or circumvents DIRECTV's encryption technology. In the spring of 2001, DIRECTV conducted a civil raid of the shipping facility used by one of these companies, White Viper Technologies. Through this enforcement action, DIRECTV obtained records listing the sale of piracy devices to thousands of private individuals including Cavanaugh. It is undisputed in this case that Cavanaugh purchased the piracy device, was a DIRECTV subscriber, and possessed a DIRECTV receiver.

DIRECTV initiated a program called the End User Development Group ("EUDG") to target the individuals who purchased signal theft devices. EUDG sent approximately 100,000 nearly identical demand letters informing individuals suspected of signal piracy that DIRECTV had obtained the sales records of the equipment and was contemplating litigation. Furthermore, the EUDG letters warned that federal and state statutes imposed fines of up to $10,000 per use of signal theft equipment to gain unauthorized access. The EUDG letters explained the statutory regime prohibiting signal theft was "[s]o strict…that Congress has made the **mere possession** of signal theft equipment a violation of federal law in certain circumstances." (emphasis in the original).

The two EUDG letters received by Cavanaugh indicated DIRECTV was willing to forego litigation if he agreed within two weeks to: (1) surrender any signal theft devices in his possession, (2) execute a written statement that he would not take part in further unauthorized reception of DIRECTV's programming; and (3) pay a non-negotiable amount in settlement. According to Cavanaugh, EUDG instructed its investigators to demand payment of $3,500 per individual regardless of the facts or circumstances of each case. Cavanaugh also alleges DIRECTV utilized this settlement "strategy" to force individuals to subscribe to lengthy subscription packages as a condition for settlement.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) authorizes the Court to grant summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." There is no genuine issue of material fact if there is no factual dispute that could affect the legal outcome on the issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In other words, the movant must show he would prevail on the issue even if all factual disputes are conceded to the

non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. CAVANAUGH'S MOTION FOR SUMMARY JUDGMENT

Cavanaugh requests the Court to find, as a matter of law, that he cannot be held liable for violating the Electronic Communications Privacy Act ("ECPA"), because the relevant provisions of the statute, 18 U.S.C. § 2511 and 18 U.S.C. § 2512, are criminal in nature and do not authorize a civil remedy. In addition, Cavanaugh contends he is entitled to summary judgment on all of DIRECTV's claims because DIRECTV has failed to present any direct evidence that he intercepted DIRECTV's satellite programming using the piracy device as required by the ECPA.

### A. The Electronics Communications Privacy Act Claims

Cavanaugh first challenges DIRECTV's ability to bring a civil suit under 18 U.S.C. §§ 2511 and 2512. Cavanaugh argues these provisions are criminal in nature and do not provide for a civil remedy. Together with § 2520, § 2511 provides for liability when satellite signals are actually intercepted. Section 2512, in contrast, penalizes the *mere possession* of signal theft devices that have been sent through interstate commerce. Therefore, allowing a private cause of action under § 2512 would considerably broaden the civil enforcement scope of the ECPA, as it would entitle companies like DIRECTV to relief based on mere possession of signal theft devices.

18 U.S.C. § 2511(1)(a) reads:

[A]ny person who... *intentionally intercepts, endeavors to intercept, or procures any other person to intercept* or endeavor to intercept, any wire, oral or electronic communication...shall be...subject to suit...

(emphasis added).

18 U.S.C. § 2512(1)(b) provides, in pertinent part:

[A]ny person who intentionally...manufactures, assembles, *possesses,* or sells any...device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of...electronic communications, and that such device...has been or will be sent through the mail or transported in interstate...commerce...shall be fined under this title or imprisoned not more than five years, or both.

(emphasis added).

18 U.S.C. § 2520(a) indicates:

Except as provided in section 2511(2)(a)(ii), any person whose wire, oral, or electronic communication is *intercepted, disclosed, or intentionally used* in violation of this chapter may in a civil action recover from the person...which engaged in that violation such relief as may be appropriate...

(emphasis added).

There is significant disagreement among district courts currently handling DIRECTV litigation as to the extent the ECPA provides for a private cause of action. While all the courts appear to agree § 2520 authorizes a civil cause of action under § 2511, there is a split in authority as to whether § 2520 authorizes a cause of action under § 2512. *Compare Flowers v. Tandy Corp.*, 773 F.2d 585, 589 (4th Cir. 1985) (finding no civil remedy for violations of § 2512) *with DIRECTV, Inc. v. Calamanco*, Case No. 5:02–CV–4102–MWB, 2003 WL 21956187, at *2 (N.D.Iowa Jan.21, 2003) (finding civil remedy for violations of § 2512).

On the one hand, a variety of district courts have found a civil remedy exists for § 2512. *See Oceanic Cablevision, Inc. v. M.D. Electronics,* 771 F.Supp. 1019 (D.Neb.1991); *DIRECTV, Inc. v. Drury,* Case No. 8:03–CIV–850T17–TGW, 2003 WL 22245388, at *3 (M.D.Fla. June 26, 2003). Most notably, the *Oceanic Cablevision* court held a private remedy existed for violations of § 2512 because "the 1986 amendments to §§ 2510–2521 broadened § 2512 to prohibit the selling of devices capable of use in the surreptitious acquisition of electronic communications." 771 F.Supp. at 1028. The court believed the legislative history of the Communications Act of 1986 reflected Congress' intent to address the malicious interference with satellite transmissions and home viewing of pirate satellite transmissions. *Id.* at 1029 (citing S.Rep. No. 541, 99th Cong., 2d Sess. 6–7, *reprinted in* 1986 U.S.Code Cong., & Admin.News 3555,3560–61).

Several courts have found *Oceanic Cablevision* to be persuasive without conducting an independent review of the statutory language of § 2520. *See, e.g., DIRECTV, Inc. v. EQ Stuff, Inc.,* 207 F.Supp.2d 1077, 1084 (C.D.Cal.2002) (adopting the *Oceanic Cablevision* holding without examining the tension between §§ 2511 and 2512). At least one judge appears to have adopted *Oceanic Cablevision's* broad interpretation of § 2520 almost entirely on policy grounds. *DIRECTV, Inc., v. Perez,* Case No. 03 C 3504, 2003 WL 22038403, at *2 (N.D.Ill. Aug.27, 2003); *DIRECTV, Inc. v. Gatsiolis,* Case No. 03 C 3534, 2003 WL 22111097 at *2 (N.D.Ill. Sept.10, 2003). The *Perez* court noted:

> While this interpretation does provide a rather broad ability to bring the private right of action, granting this right of action decreases the burden on already overextended federal prosecutors to pursue criminal convictions under this statute. Moreover, potential plaintiffs whose electronic communications are being intercepted are equipped with the incentives to initiate litigation to protect their private interests. Granting that class of plaintiffs a broad right of action will help to guarantee the collapse of the manufacture, distribution, and use network for interception of electronic communications.

2003 WL 22111097, at *2.

On the other hand, the Fourth Circuit and the majority of district courts have found no authorization under § 2520 for a private suit based on mere possession. *See generally Flowers,* 773 F.2d at 589; *Ages Group, L.P. v. Raytheon Aircraft Co.,* 22 F.Supp.2d 1310 (M.D.Ala.1998); *DIRECTV, Inc. v. Cardona,* 275 F.Supp.2d 1357 (M.D.Fla.2003). In *Flowers,* the Fourth Circuit examined an earlier version of the ECPA and determined no private remedy existed for § 2512 because the plain language of § 2520 addressed a class of persons similar to those defined in § 2511 but not in § 2512, 773 F.2d at 588. In comparing §§ 2511 and 2512, the court found the former section was aimed at protecting particular victims whose transmissions had been intercepted with piracy devices. *Id.* at 589 (citations omitted). The latter section, in contrast, "appears to have been designed for benefitting the public as a whole by removing such devices from the market." *Id.* The court warned:

> implied causes of action are disfavored and should be found only where a statute clearly indicates that the plaintiff is one of a class for whose benefit the statute was enacted and there is some indication that Congress intended such a cause of action to lie.

*Id.* The court thereby reasoned that the private cause of action authorized by § 2520 was limited to actions brought by particular victims under § 2511.

Although Congress amended § 2520 three times after the *Flowers* ruling, the

operative language of the statute remains the same for the purposes of the instant case. A number of courts have rejected the view of *Oceanic Cablevision* and its progeny that the 1986 Amendments broadened the scope of § 2520. The court in *DIRECTV, Inc. v. Amato,* 269 F.Supp.2d 688, 691 (E.D.Va.2003), found that the only change caused by the amendments is that victims of signal piracy can no longer "sue the maker or seller of an otherwise lawful device that is later used to commit a crime." Likewise, the *Cardona* court held that "[w]hile the Wiretap Act's amendments may have broadened the criminal proscriptions in 18 U.S.C. § 2512(1)(b), it can be stated with relative case that such amendments did not expand the conduct subjecting individuals to civil liability under § 2520(a)." 275 F.Supp.2d at 1366–67. These courts have criticized decisions adhering to the minority interpretation for overlooking the plain and unambiguous language of § 2520 and the strength of the Fourth Circuit's reasoning in *Flowers.*

■ The Court finds the Fourth Circuit's interpretation to be persuasive and rejects DIRECTV's contention that the ECPA creates a civil cause of action for mere possession of signal theft devices. The Court agrees that "[t]o recognize a cause of action in this instance would be tantamount to denying the language of § 2520(a) its ordinary meaning." *Cardona,* 275 F.Supp.2d at 1366–67. The language of § 2520 clearly and unambiguously limits private enforcement to instances where satellite transmissions are *"intercepted, disclosed, or intentionally used."* 18 U.S.C. § 2520 (emphasis added). DIRECTV's request for relief would have this Court extend the civil remedies provided by § 2520 to all of the conduct prohibited by the ECPA, rather than the specific subset of conduct that involved interception. *See DIRECTV, Inc. v. Rodriguez,* Case No. 6:03–cv–711–Orl–19DAB, at 5 (M.D.Fla. Sept. 9, 2003). Therefore,

the Court dismisses DIRECTV's claim under § 2512 and allows its claim under § 2511 to proceed.

## B. Remaining Claims

■ Having eliminated DIRECTV's claim under § 2512, it remains to be determined whether there is a triable issue of fact as to whether Cavanaugh unlawfully intercepted DIRECTV's satellite programming. In deciding whether summary judgment is appropriate, each count of DIRECTV's complaint need not be considered separately because DIRECTV's allegations of conversion under Michigan common law and violations of 47 U.S.C. § 605(a) and 18 U.S.C. § 2511(1)(a) are premised on the same facts.

Cavanaugh requests summary judgment on the grounds that DIRECTV has conceded, through its representative Larry Rissler, that the company has no direct evidence of signal interception. Cavanaugh adamantly denies having used the device he purchased from White Viper Technologies to intercept DIRECTV's programming. In response, DIRECTV argues there is sufficient evidence for the trier of fact to infer Cavanaugh illegally intercepted DIRECTV's satellite broadcasts. DIRECTV emphasizes that many of the telltale signs of piracy are present in this case: (1) Cavanaugh purchased signal theft devices designed to circumvent DIRECTV's security measures; (2) Cavanaugh's account history with DIRECTV show decreases in subscription to premium channels or movies that correspond with the dates of the purchases; and (3) Cavanaugh complained of equipment failure that likely resulted from illegal tampering.

Considering this evidence in the light most favorable to DIRECTV, it is apparent there is a genuine factual dispute as to whether Cavanaugh actually intercepted DIRECTV's satellite broadcasts. While

Cavanaugh is correct that there is no direct evidence of interception, DIRECTV's evidence certainly creates a strong inference that he did engage in illegal signal theft. An almost identical case recently decided in this district is directly on point. *DirecTV v. Karpinsky*, 269 F.Supp.2d 918 (E.D.Mich.2003), *vacated in part on other grounds*, 274 F.Supp.2d 918 (E.D.Mich. 2003). In *Karpinsky*, the court rendered summary judgment against DIRECTV because there was no evidence that Karpinsky was a DIRECTV subscriber or had the necessary receiver in which pirate access cards could be installed. *Id.* at 927. However, on DIRECTV's Motion for Reconsideration, the court found that summary judgment was no longer appropriate because DIRECTV had come forward with "compelling evidence" showing that Karpinsky did indeed possess a DIRECTV receiver. From this evidence, the court held that "a fact-finder could reasonably infer that Karpinsky did in fact unlawfully intercept or aid in unlawfully intercepting DirecTV satellite signals using this DirecTV conditional access system, in conjunction with the access cards he admittedly purchased." *Karpinsky*, 274 F.Supp.2d at 920–22.

There is no reason not to apply the *Karpinsky* holding to the instant case. Cavanaugh concedes he is a DIRECTV subscriber, has the necessary DIRECTV receiver, and purchased piracy devices. This evidence alone supports the reasonable inference that signal theft did in fact occur. As a similar case, recently submitted by Cavanaugh as Supplemental Authority, indicates: "[t]hough Plaintiff may not be able to allege with specificity when exactly Cavanaugh used this equipment in his home to pirate DirecTV, it hardly taxes the imagination to suppose that such acts of piracy occurred." *Rodriguez*, Case No. 6:03–cv–711–Orl–19DAB, at 6. Accordingly, Cavanaugh's motion for summary judgment is denied.

## IV. DIRECTV'S MOTION FOR SUMMARY JUDGMENT

DIRECTV's motion for summary judgment challenges the merits of Cavanaugh's counterclaims of: (1) extortion and conspiracy to commit extortion under 18 U.S.C. § 876; (2) violations of the Fair Debt Collections Practice Act ("FDCPA"), 15 U.S.C. § 1692, and the Michigan Fair Collection Practices Act, M.C.L. § 339.901; (3) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1692; (4) violations of the Michigan Consumer Protection Act ("MCPA"), § 445.911 *et seq.;* (5) fraud and misrepresentation; and (6) defamation. The core theory of these counterclaims is that DIRECTV acted improperly by sending thousands of generic demand letters to people suspected of signal theft. Cavanaugh alleges the goal of DIRECTV's "End User Development Group" was to coerce customers to pay hundreds of thousands of dollars in settlement fees and to agree to lengthy subscription packages.

### A. Extortion Counterclaim

■ Cavanaugh alleges DIRECTV has committed extortion or conspiracy to commit extortion in violation of 18 U.S.C. § 876. Cavanaugh submits DIRECTV violated § 876 by using the EUDG demand letters to coerce customers into paying money and agreeing to lengthy service contracts to avoid defending a lawsuit. Cavanaugh concedes § 876 is a federal criminal statute and does not authorize a civil remedy. However, Cavanaugh wishes to establish a violation of the statute to serve as a predicate act for his RICO counter-claim, discussed below.

■ Generally, a threat to file a lawsuit, even if made in bad faith, does not constitute extortion. *See U.S. v. Pendergraft*, 297 F.3d 1198, 1204 (11th Cir.2002); *First Pacific Bancorp, Inc. v. Bro*, 847 F.2d 542, 547 (9th Cir.1988); *I.S. Joseph Co. v. J.*

*Lauritzen A/S*, 751 F.2d 265, 267–68 (8th Cir.1984). In the RICO context, the Sixth Circuit has held "[a] threat of litigation if a party fails to fulfill even a fraudulent contract...does not constitute extortion" and cannot constitute a predicate act under the statute. *Vemco, v. Camardella*, 23 F.3d 129, 134 (6th Cir.1994). *See also Karpinsky*, 269 F.Supp.2d at 928–30. *Vemco* makes clear that the threat of litigation in this case, even if made in bad faith, does not constitute extortion and therefore does not support Cavanaugh's RICO claim. *Id.* Accordingly, DIRECTV is entitled to summary judgment on the extortion counterclaims.

### B. Fraud and Misrepresentation Counterclaim

■ Cavanaugh alleges the EUDG demand letters made false representations of material fact concerning his use of piracy devices and the legal consequences of that use. Cavanaugh submits he relied on these representations as evidenced by his hiring of counsel who had to make long-distance telephone calls to DIRECTV employees to inquire about the accusations in the demand letters. DIRECTV, in response, argues summary judgment is appropriate because Cavanaugh has failed to plead fraud with particularity.

■ Federal Rule of Civil Procedure 9(b) requires parties to plead fraud with particularity.[1] *See also FFOC Co. v. Invent A.G.*, 882 F.Supp. 642, 659 (E.D.Mich. 1994) ("Failure to state a fraud claim with particularity constitutes failure to state a claim.") (citation omitted). In determining whether this particularity requirement has been satisfied,

> a court must factor in the policy of simplicity in pleading which the drafters of the Federal Rules codified in Rule 8. Rule 8 requires a "short and plain state-

ment of the claim," and calls for "simple, concise, and direct allegations." Indeed, Rule 9(b)'s particularity requirement does not mute the general principles set out in Rule 8; rather, the two rules must be read in harmony.

*Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir.1988) (citations omitted). The underlying rationale of Rule 9(b) is to apprise the party accused of fraud of the nature of the claim against him and "of the acts relied upon as constituting the fraud charged." C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE, § 1297 (2d ed.1990).

■ To establish a claim of fraud under Michigan law, Cavanaugh needs to show (1) DIRECTV made a material misrepresentation (2) which was false and (3) which DIRECTV knew was false. Furthermore, it must be established that (4) DIRECTV intended Cavanaugh to act on the false representation and that (5) Cavanaugh *acted in reliance upon it* and (6) thereby suffered injury. *Belle Isle Grill Corporation v. City of Detroit*, 256 Mich. App. 463, 477, 666 N.W.2d 271 (2003) (citation omitted). Reliance is not present when the complaining party was aware of the falsity of the representation. *McIntyre v. Lyon*, 325 Mich. 167, 174, 37 N.W.2d 903 (1949).

The Court need not consider whether Cavanaugh's counterclaim fails for want of particularity since it is apparent he is unable to establish the elements of fraud. Even assuming DIRECTV intentionally made a false, material misrepresentation, Cavanaugh is unable to demonstrate he acted in reliance upon the demand letters. Cavanaugh contends the demand letters forced him to retain attorneys and to make long distance telephone calls. This does

---

1. Fed.R.Civ.P. 9(b) provides, in relevant part, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

not constitute reliance. On the contrary, the fact that Cavanaugh did not accept the settlement offer and instead sought legal advice demonstrates he did not rely on DIRECTV's allegedly false legal statements. Cavanaugh undermines his claim of reliance by continually insisting he never engaged in signal theft. Assuming this is true, then Cavanaugh would know that DIRECTV's allegations of signal piracy were false. "Knowledge of the falsity of representation is inconsistent with reliance thereon." *McIntyre*, 325 Mich. at 174, 37 N.W.2d 903. *See also Karpinsky*, 269 F.Supp.2d at 929 (dismissing fraud counterclaim for failure to show reliance). Since Cavanaugh is unable to demonstrate reliance, DIRECTV is entitled to summary judgment on the fraud and misrepresentation counterclaims.

### C. Defamation

■■■ Cavanaugh alleges DIRECTV committed defamation by publishing the content of the EUDG demand letters to third parties with knowledge of the falsity of the statements or in reckless disregard of their truth or falsity. Actionable defamation, under Michigan law, consists of:

(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party; (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statements irrespective of special harm or the existence of special harm caused by the publication.

*Gonyea v. Motor Parts Federal Credit Union*, 192 Mich.App. 74, 76–77, 480 N.W.2d 297 (1991). Generally the elements of defamation "must be specifically pleaded, including the allegations with respect to the defamatory words, the connection between the plaintiff and the defamatory words, and the publication of the alleged defamatory words." *Id.* at 77, 480 N.W.2d 297.

Clearly, Cavanaugh's defamation counterclaim fails for want of particularity. As Cavanaugh fails to identify to whom the alleged publications were made, the Court grants summary judgment in favor of DIRECTV. *Gonyea*, 192 Mich.App. at 78–79, 480 N.W.2d 297. *See also Karpinsky*, 269 F.Supp.2d at 929; *DIRECTV, Inc. v. Milliman*, Case No. 02–74829 (E.D.Mich. Aug. 26, 2003) (dismissing defamation counterclaim on identical grounds).

### D. The Fair Debt Collection Practices Act and the Michigan Collection Practices Act Counterclaims

■■■ Cavanaugh alleges the EUDG demand letters are an improper collection of debt from consumers in violation of both federal and Michigan law. Cavanaugh reasons that since DIRECTV has no direct evidence of signal interception, the demand letters can only be interpreted as an attempt to over bill him for programming in excess of his subscription.

■■■ It is clear Cavanaugh is unable to bring the EUDG demand letters within the purview of the FDCPA. The FDCPA protects consumers from "abusive, deceptive, and unfair debt collection practices." 15 U.S.C. § 1692. The Act prohibits debt collectors from using "any false, deceptive, or misleading representation in connection with the collection of any debt." 15 U.S.C. § 1692e. In order for the FDCPA to apply, the practice in question must constitute an attempt to collect a "debt." The FDCPA defines debt as:

any obligation or alleged obligation of a consumer to pay money *arising out of a transaction* in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family or household purposes, whether or not such obligation has been reduced to judgment.

15 U.S.C. § 1692a(5) (emphasis added). The type of transaction that gives rise to

"debt" involves the offer or extension of credit to a consumer. *See generally* Wayne Hill, Annotation, *What Constitutes "Debt" for Purposes of Fair Debt Collection Practices Act,* 159 A.L.R. Fed. 121, § 4, 2000 WL 150759 (2000). A theft of property or services is not a consensual transaction that can give rise to a debt under the FDCPA. *Shorts v. Palmer,* 155 F.R.D. 172 (S.D.Ohio 1994). "[A]lthough a thief undoubtedly has an obligation to pay for the goods or services he steals, the FDCPA limits its reach to those obligations to pay arising from consensual transactions, where parties negotiate or contract for consumer-related goods or services." *Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.,* 111 F.3d 1322, 1326 (7th Cir.1997).

Since signal piracy constitutes theft, it cannot be considered a transaction under the FDCP. *See Zimmerman v. HBO Affiliate Group,* 834 F.2d 1163 (3d Cir.1987); *Coretti v. Lefkowitz,* 965 F.Supp. 3, 5 (D.Conn.1997). Courts have found uniformly that broadcasting companies do not violate the FDCPA when they send demand letters to suspected signal pirates, calling for the removal of unauthorized equipment and payment of a settlement fee, because the letters cannot be construed as an offer or extension of credit to a consumer. *DIRECTV v. Breedlove,* Case No. 02–CV–679–BR3 (E.D.N.C. Mar. 18, 2003); *Karpinsky,* 269 F.Supp.2d at 927; *Milliman,* Case No. 02–74829, at 5. For example, in *Zimmerman,* the Third Circuit found that HBO was not seeking to collect a "debt" within the meaning of the FDCPA when the company sent 5,600 letters demanding immediate removal of unauthorized equipment and payment of a non-negotiable settlement. 834 F.2d at 1167. Similarly, the *Breedlove* court dismissed a counterclaim alleging DIRECTV violated the FDCP by sending demand letters to consumers. Case No. 02–CV–679–BR3, at 3. The fact that one of the

*Breedlove* defendants was a customer of DIRECTV did not transform the demand letter into a "debt" collection practice because "with respect to the services at issue...she was not a 'consumer' or paying customer [sic], but rather an alleged thief." *Id.* at 8 (citing *Coretti,* 965 F.Supp. at 5).

Cavanaugh offers no persuasive reason why this Court should deviate from the above holdings. Cavanaugh argues that "[i]f DIRECTV has no actual knowledge of signal theft then as a subscriber of DIRECTV's services any programming received but not paid for would be a debt." This argument only serves to confuse the legal meaning of "debt" under EUDG. Cavanaugh would have the Court believe that if there is no evidence of theft, then the demand letters are mere over billing for excessive programming that was received but not paid for.

Even if there was no evidence of piracy, Cavanaugh's argument still falters because it fails to distinguish between the dictionary and statutory meanings of the word "debt." By arguing that the receipt of unsubscribed-to signals constitutes some sort of surplus or mistaken credit, Cavanaugh attempts to divorce the notion of "debt" from the text of the statute. The receipt of satellite signals above and beyond what was subscribed to simply does not give rise to the type of consensual transaction envisioned by the FDCPA. Accordingly, the Court finds the demand letters do not seek to collect a "debt" within the meaning of the Act.

The above analysis is applicable to Cavanaugh's counterclaim under Michigan law since the definition of debt in the Michigan Collections Practice Act tracks that of the FDCPA. *Milliman,* Case No. 02–74829, at 6–7. It is not unusual for courts interpreting the Michigan Collection Practice Act to look to the FDCPA for guidance. *See Burns v. Accelerated Bureau of Collec-*

*tions, Inc.,* 828 F.Supp. 475, 476 (E.D.Mich.1993); *Asset Acceptance Corp. v. Robinson,* 244 Mich.App. 728, 732–35, 625 N.W.2d 804 (2001). Accordingly, Cavanaugh's counterclaim under the Michigan Collections Practice Act also fails as a matter of law.

### E. Michigan Consumer Protection Act Counterclaim

 Cavanaugh claims DIRECTV violated the MCPA through its use of the EUDG demand letters. The goal of the MCPA is "to protect consumers in their purchases of goods which are primarily used for personal, family or household purposes." *Noggles v. Battle Creek Wrecking, Inc.,* 153 Mich.App. 363, 367, 395 N.W.2d 322 (1986). In order for the Act to apply, a plaintiff must demonstrate the existence of "trade or commerce"-defined as:

> the conduct of a business providing goods, property, or service primarily for personal, family, or household purposes and includes the advertising, solicitation, offering for sale or rent, sale, lease, or distribution of a service or property, tangible or intangible, real, personal, or mixed, or any other article, or a business opportunity.

M.C.L. § 445.902(d). "The MCPA is a remedial statute designed to prohibit unfair practices in trade or commerce and must be liberally construed to achieve its intended goals." *Forton v. Laszar,* 239 Mich.App. 711, 715, 609 N.W.2d 850 (2000). Accordingly, the "trade or commerce" requirement has been found to be satisfied, despite the absence of a specific transaction between the parties involving the purchase of consumer goods. *Action Auto Glass v. Auto Glass Specialists,* 134 F.Supp.2d 897 (W.D.Mich.2001).

At issue in this motion is only whether Cavanaugh can establish the threshold requirement of the MCPA, "trade or commerce." Both parties have failed to present cases which interpret the "trade or commerce" requirement and appear to view the MCPA as analogous to the FDCPA. While DIRECTV accuses Cavanaugh of merely repackaging his earlier claim of unlawful debt collection, DIRECTV itself merely repeats its earlier defenses. The crux of DIRECTV's defense is that there was no "trade or commerce" between it and Cavanaugh because he engaged in signal piracy and piracy is not a consensual "transaction." For the same reason, DIRECTV contends Cavanaugh lacks standing to bring this counterclaim because he is not a "consumer" within the meaning of the MCPA. Indeed, Plaintiff implies that allowing the MCPA counterclaim to proceed would be ironic since the statute's purposes is to protect consumers, not criminals.

 The FDCPA and the MCPA are different statutes and warrant separate attention. Unlike the FDCPA, the MCPA does not require a "transaction" between the parties. For example, in *Action Auto Glass,* the court found the MCPA's trade or commerce requirement was satisfied even though there was no transaction between the parties. 134 F.Supp.2d at 901. The court explained "[t]here is no requirement that consumer goods be *sold or purchased* in order to constitute 'trade or commerce,' although a sale of consumer goods or services is an example of conduct constituting 'trade or commerce.'" *Id.* (emphasis in the original). Thus, DIRECTV's reliance on the same "transaction" argument it proffered in response to the FDCA counterclaim is unjustified. The MCPA may apply in this case, even though DIRECTV alleges its goods were being stolen instead of purchased by Cavanaugh. *See Milliman,* Case No. 02–74829, at 9–11.

 Moreover, on summary judgment, the MPCA counterclaim is more properly addressed to DIRECTV's conduct. The

issue is whether DIRECTV was acting in an impermissible fashion, not whether the Cavanaugh was engaged in signal piracy. At the time the demand letters were sent, DIRECTV had already accepted Cavanaugh's subscription and chose not to cancel or suspend his services. It is apparent, therefore, that the parties *were* in a relationship involving "trade or commerce," namely the subscription sale of satellite broadcasting. In addition, keeping in mind that under Rule 56 "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor," *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 (citation omitted), a triable issue of fact exists as to whether DIRECTV was using the demand letters in an impermissible fashion. Given that DIRECTV's representative did testify that the company had no direct knowledge of actual signal theft, the trier of fact could find the mass-mailing of generic demand letters to be an improper attempt under the MCPA to coerce or confuse consumers into paying fees or agreeing to lengthy subscriptions. Consequently, DIRECTV's motion for summary judgment is denied in order to allow the record to be developed as to whether there was specific violation under § 445.903 of the MCPA.

## F. RICO Counterclaim

■■■■ Cavanaugh argues the use of the EUDG establishes a pattern of racketeering activity in violation of RICO. Congress enacted the Racketeer Influenced and Corrupt Organizations Act to address the growing concern over organized crime's infiltration of legitimate business and trade. The statute provides for both criminal penalties and civil remedies, potentially in the form of treble damages. 18 U.S.C. § 1962. To state a RICO claim, Cavanaugh must plead facts tending to establish that DIRECTV: "(1) acquired or maintained (2) through a pattern of racketeering activity or the collection of an un-

lawful debt (3) an interest in or control of an enterprise (4) engaged in, or the activities of which affect, interstate or foreign commerce." *Advocacy Org. For Patients and Providers v. Auto Club Ins. Ass'n,* 176 F.3d 315, 321–22 (6th Cir.1999) (quotations omitted). Given the "opprobrium" and exposure to treble damages that a RICO claim brings to a party, "courts should eliminate frivolous RICO claims at the earliest stage of litigation." *Durant v. ServiceMaster Co.,* 159 F.Supp.2d 977, 981 (E.D.Mich.2001) (citation omitted).

Cavanaugh, as a matter of law, cannot identify two or more predicate acts that demonstrate a pattern of racketeering activity. As previously discussed, Cavanaugh's extortion, FDCPA, fraud, and defamation counterclaims lack merit. These allegations fare no better as RICO predicate acts than they did as independent claims. Furthermore, Cavanaugh has presented no authority that its allegations under the MCPA can satisfy the predicate act requirement. Since Cavanaugh's RICO counterclaim merely "parrot[s] the language of the RICO statute" and omits to identify two or more predicate acts, Cavanaugh has failed to allege satisfactorily racketeering activity. *Advocacy Organization,* 176 F.3d at 329. DIRECTV is therefore entitled to summary judgment.

## G. The *Noerr–Pennington* Doctrine

DIRECTV contends all of Cavanaugh's counterclaims are barred under the *Noerr–Pennington* doctrine. Since the Court has granted summary judgment on all but one of Cavanaugh's counterclaims, the invocation of *Noerr* immunity is only pertinent to a potential action under the Michigan Consumer Protection Act. In order to determine whether DIRECTV is entitled to summary judgment, the Court must determine (1) whether the *Noerr–Pennington* doctrine applies outside of the antitrust context and (2) whether the

EUDG demand letters are entitled to immunity.

### 1. The Boundaries of Noerr Immunity

 The *Noerr–Pennington* doctrine immunizes from federal antitrust liability activity that attempts to influence government decision-making even when the underlying purpose of the activity is to restrain competition and thereby gain a competitive advantage. *See generally Eastern Railroad Presidents v. Noerr Motor Freight*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 670, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). The doctrine gains its name from two antitrust cases where the Supreme Court refused to interpret the Sherman Act as to prohibit petitioning activity because the "right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." *Noerr*, 365 U.S. at 138, 81 S.Ct. 523. The *Noerr–Pennington* doctrine does not apply, however, when it is shown the suit is a "mere sham" filed for harassing a competitor and damaging the competitive process. *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus. Inc.*, 508 U.S. 49, 60–61, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993). Furthermore, at least two Courts of Appeals agree the *Noerr–Pennington* doctrine provides only a defense to liability rather than immunity from suit. *Acoustic Sys., Inc. v. Wenger Corporation*, 207 F.3d 287, 296 (5th Cir.2000); *We, Inc. v. City of Philadelphia*, 174 F.3d 322, 326 (3d Cir.1999).

 The *Noerr–Pennington* doctrine, as originally formulated by the Supreme Court, rests on two separate grounds. First, a statutory interpretation of the Sherman Act that limits the scope of the Act so as to not reach activity associated with the political process. *Noerr*, 365 U.S. at 137–38, 81 S.Ct. 523 (finding "no basis whatever in the legislative history of that Act" that would allow the government to regulate "political activity" instead of "business activity"). Second, the First Amendment right of citizens to petition the government. *Id.*

 Since the current dispute is not regulated by the Sherman Act, the Court is reluctant to apply the *Noerr–Pennington* doctrine. DIRECTV cites a variety of *antitrust* cases in support of its claim of immunity, none of which address the viability of the doctrine in non-antitrust conflicts. On the contrary, a variety of courts have acknowledged the incongruity of applying the *Noerr–Pennington* doctrine outside of the antitrust context where immunity is cognizable only on First Amendment grounds. *See generally Cardtoons,L.C., v. Major League Baseball Players Ass'n*, 208 F.3d 885 (10th Cir. 2000); *We, Inc.*, 174 F.3d at 326. In *Cardtoons*, for example, the Tenth Circuit, explained:

> While we do not question the application of the right to petition outside of antitrust, it is a bit of a misnomer to refer to it as the *Noerr–Pennington* doctrine; a doctrine which was based on *two* rationales. In our view, it is more appropriate to refer to immunity as *Noerr–Pennington* immunity only when applied to antitrust claims. In all other contexts, including the present one, such immunity derives from the right to petition.

*Cardtoons*, 208 F.3d at 889–90 (footnote omitted) (emphasis in the original). Cf. *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 859 n. 7 (5th Cir.2000) (acknowledging the Tenth Circuit's distinction but choosing not to apply it because the case at hand involved an antitrust claim). The Court concludes that the clearest, if not most legally accurate manner to examine DI-

RECTV's claim of immunity is under the Petition Clause of the First Amendment.[2] *But see Milliman,* Case No. 02–74829 (finding that the *Noerr–Pennington* doctrine immunized DIRECTV from a suspected signal pirate's counterclaims).

## 2. The First Amendment Right to Petition

 The remaining issue before the Court is whether the First Amendment affords DIRECTV immunity from suit regarding any misconduct arising from the EUDG demand letters. The First Amendment guarantees "the right of the people...to petition the Government for a redress of grievances." The right to petition "is implicit in '[t]he very idea of government, republican in form.'" *McDonald v. Smith,* 472 U.S. 479, 482, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985) (quotations omitted). "A citizen's right to petition is not limited to goals that are deemed worthy, and the citizen's right to speak freely is not limited to fair comments." *Eaton v. Newport Board of Education,* 975 F.2d 292, 298 (6th Cir.1992). Additionally, "the right of access to courts is an aspect of the First Amendment right to petition the Government for redress of grievances." *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983).

 The right to petition, however, is not absolute. The Petition Clause "neither enjoys 'special First Amendment status' nor confers an 'absolute immunity' for privilege.'" *We, Inc.,* 174 F.3d at 327 (quoting *McDonald,* 472 U.S. at 484–85, 105 S.Ct. 2787). Accordingly, a claim of immunity under the Petition Clause must be evaluated under the same First Amendment framework that applies to other constitutionally protected activity.

Even if the EUDG demand letters somehow implicated DIRECTV's right to petition the government through the court system,[3] granting DIRECTV automatic and absolute immunity would be at odds with well established First Amendment principles. In *McDonald,* for example, an unsuccessful candidate for appointment as United States Attorney brought a libel suit against an individual who had written a letter to President Reagan accusing the candidate of fraud, extortion, and other misconduct. The author of the letter claimed the First Amendment right to petition gave him absolute immunity. The Supreme Court found otherwise:

> To accept petitioner's claim of absolute immunity would elevate the Petition Clause to special First Amendment status. The Petition Clause, however, was inspired by the same ideals of liberty and democracy that gave us the free-

**2.** The Court notes, however, that this unfortunate "misnomer" has developed a life of its own. Initially, courts were careful in referring to the *Noerr–Pennington* doctrine only *by analogy* when discussing the First Amendment right to petition. *See e.g., We, Inc.,* 174 F.3d at 326–27 ("This court, along with other courts, has *by analogy* extended the *Noerr–Pennington* doctrine to offer protection to citizens' petitioning activities in contexts outside the antitrust area as well.") (emphasis added) (emphasis added); *Eaton v. Newport Bd. of Educ.,* 975 F.2d 292 (6th Cir.1992) (finding "support *by analogy* to the *Noerr–Pennington* doctrine" that immunity extends to petitioning activity) (emphasis added). However,

courts and practitioners citing those initial cases have loosely referred to the immunity afforded by the Petition Clause as the *"Noerr–Pennington"* doctrine. Consequently, there is a marked inconsistency in the manner in which immunity afforded by the First Amendment is discussed.

**3.** Since the Court finds that the Petition Clause does not afford DIRECTV immunity from suit, the Court finds it unnecessary to decide whether the prelitigation threats communicated in the EUDG demand letters constitute or implicate a "petition" to the government.

doms to speak, publish, and assemble. These First Amendment rights are inseparable, and there is no sound basis for granting greater constitutional protection to statements made in a petition to the Presidents than other First Amendment expressions.

*Id.* at 485, 105 S.Ct. 2787. Despite the existence of a petition to the government, the Court found that absolute immunity was inappropriate. "The right to petition is guaranteed; the right to commit libel with impunity is not." *Id.*

Relying on the *McDonald* decision, the Tenth Circuit has found that written, prelitigation threats between private parties are not entitled to immunity under the First Amendment. *Cardtoons,* 208 F.3d at 891. The *Cardtoons* plaintiff contracted with a printing company to create parody baseball cards containing images of major league players. The Major League Baseball Players Association ("MLBPA") sent cease and desist letters to both the plaintiff and the printing company. Upon receiving its letter, the printing company informed the plaintiff it would not print the cards. The plaintiff then filed suit alleging the MLBPA had tortuously interfered with its printing contract. Both the district court and an appeals panel found the MLBA was immune from liability under the *Noerr–Pennington* doctrine even though the case did not involve antitrust law. *Cardtoons, L.C. v. Major League Baseball Players Ass'n,* 182 F.3d 1132 (10th Cir.1999). On rehearing, however, an *en banc* panel found the prelitigation threats in the cease and desist letter to Champs were not afforded immunity by either the First Amendment right to petition or the *Noerr–Pennington* doctrine. 208 F.3d at 886. The Tenth Circuit reasoned that if the plaintiff had sued MLBPA for libel, the suit similarly would be allowed to proceed. *Cardtoons,* 208 F.3d at 891. "[S]tatements made in a letter threatening litigation are not abso-

lutely protected by the petition clause of the First Amendment and are subject to the principles of state common law and state statutory law." *Id.* at 892. The court concluded by noting that "[w]hile there are many persuasive policy arguments in favor of granting immunity to private threats of litigation, these do not override the clear language of the First Amendment. Such arguments are best addressed to state legislative bodies...." *Id.*

Pursuant to the *McDonald* and *Cardtoons* decisions, DIRECTV should not be allowed to violate the Michigan Consumer Protection Act with impunity. Cavanaugh is not foreclosed from challenging DIRECTV's use of the EUDG demand letters simply because DIRECTV made references to the validity of its legal claim and threatened litigation. If DIRECTV were being sued properly for libelous statements it had made in the demand letters, it is clear the libel suit should be permitted to proceed as in *McDonald.* Similarly, Cavanaugh's claim under Michigan statutory law should be allowed to proceed.

Lastly, it is difficult to see how subjecting DIRECTV to liability under the MCPA would chill its right to petition the government and seek redress. At issue in this motion is not DIRECTV's right to use demand letters as a means of encouraging settlement, but rather its use of false or misleading statements in the demand letters. If Cavanaugh's allegations are proven at trial, punishing DIRECTV will not deter future use of demand letters. At best, it will encourage the company to investigate carefully its accusations and to be precise in the language it uses when attempting to settle with suspected signal pirates.

## V. CONCLUSION

For the foregoing reasons, Cavanaugh's and DIRECTV's motions for summary judgment are GRANTED in part and DENIED in part. While DIRECTV's claim under 18 U.S.C. § 2512 is dismissed, the company's claims under 18 U.S.C. §§ 2511 & 2520, 47 U.S.C. § 605(a), and Michigan common law are allowed to proceed. In regards to Cavanaugh's counterclaims, only the alleged violation of the MCPA survives summary judgment.

IT IS SO ORDERED.